Patricia **MALE**, Linda **Murray**, Lillian **Horne**, **Rose Sherroll**, and Jane Doe, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

**CROSSROADS ASSOCIATES**, David Bogdanoff and Muriel Bogdanoff, individually and as copartners doing business under the Name of Crossroads Associates, City of Peekskill, Michael Dibart, individually and in his capacities as Mayor of the City of Peekskill and Chairman of the Peekskill Urban Renewal Agency, and Peekskill Urban Renewal Agency, Defendants.

No. 70 Civ. 3509.

United States District Court, S. D. New York.

Dec. 3, 1970.

The Legal Aid Society of Westchester County, White Plains, N. Y., for plaintiffs; John T. Hand, Peekskill, N. Y., Martin A. Schwartz, White Plains, N. Y., Dana Freyer, of counsel.

Robinson, Silverman, Pearce, Aronsohn & Sand, New York City, for defendants Crossroads Associates, David Bogdanoff and Muriel Bogdanoff; Barry I. Fredericks, New York City, of counsel.

Greenspan, Aurnou & Davis, White Plains, N. Y., for defendants City of Peekskill, Michael DiBart and Peekskill Urban Renewal Agency; Joel Martin Aurnou, White Plains, N. Y., of counsel.

WYATT, District Judge.

This is a motion by plaintiffs for a preliminary injunction (Fed.R.Civ.P. 65) and for a determination by order that the action is to be maintained as a class action (Fed.R.Civ.P. 23(c) (1)). The motion must be in all respects denied.

The action is for a permanent injunction, for a declaratory judgment, and for money damages.

The five plaintiffs are needy women, citizens of New York and residents of Peekskill, who are receiving public assistance under the Social Welfare Law of New York, McKinney's Consol.Laws, c. 55. They and others like them are often called "welfare recipients". Four of the plaintiffs are said to be Negroes but this is irrelevant because nothing is seriously claimed, and certainly nothing has been shown, to have been done by any defendant by reason of the color of any plaintiff. There is no issue of discrimination against any plaintiff because she is black (in fact, one of the plaintiffs is white).

One of the plaintiffs in the caption is called "Jane Doe". She verified the complaint under her true name, Mary McDowell, and will be referred to hereafter under that name. No reason is given for the use of the fictitious name in the caption, which is hereby amended to substitute "Mary McDowell" for "Jane Doe". See Doe v. Shapiro, 302 F.Supp. 761 (D. Conn.1969); see also Roe v. New York, 49 F.R.D. 279 (S.D.N.Y. 1970).

Defendant Crossroads Associates (Crossroads) is a partnership which owns and operates the "Crossroads", an "apartment complex" in Peekskill which is said to be "a middle-income luxury apartment building constructed as part of the Peekskill Urban Renewal Project" (David Bogdanoff affidavit, p. 3).

Defendants David and Muriel Bogdanoff are members of the partnership, Crossroads.

Defendant City of Peekskill (sometimes "the City") is in Westchester County, New York.

Defendant Michael DiBart is Mayor of Peekskill and is also chairman of the Peekskill Urban Renewal Agency.

Defendant Peekskill Urban Renewal Agency (sometimes "the Agency"), as later more fully explained, was created in 1964 by act of the state legislature.

The claim of plaintiffs is that Crossroads has refused to accept, and has rejected, applications from plaintiffs for leases of apartments in the "Crossroads"; that such refusal is solely on the ground that plaintiffs are welfare recipients; that such action is a violation of the federal constitutional right of plaintiffs under the Thirteenth and Fourteenth Amendments; and that this Court, under the Civil Rights Acts (42 U.S.C. §§

1981, 1982, 1983, 1985), should give relief to plaintiffs. All defendants are said to be responsible for the acts of Crossroads. Jurisdiction is asserted under 28 U.S.C. §§ 1343 (civil rights), 2201, and 2202 (declaratory judgments).

The preliminary injunction sought is apparently the same as the permanent injunction prayed for in the complaint: restraining defendants from denying apartments to plaintiffs on the ground that they are welfare recipients and requiring defendants to offer to plaintiffs apartments on the same basis as offered to those not receiving public assistance.

The Thirteenth Amendment abolished slavery. There is nothing involved in this action which remotely resembles slavery and the Thirteenth Amendment may be put aside as irrelevant.

■ The real issue is whether defendants, or any one of them, have denied to plaintiffs the equal protection of the laws. The states are forbidden by the Fourteenth Amendment to do so and 42 U.S.C. § 1983 makes any person liable who "under color" of state law deprives another of a constitutional right.

A. Construction of "Crossroads"

The present controversy arises out of an urban renewal project in the City of Peekskill, financed in part by "capital grants" from the federal government under the several Housing Acts passed by Congress (42 U.S.C. § 1441 and following). The full name of the project is "Academy Street Renewal Project, New York R–45", referred to hereafter as "the Project". This action involves a part of the Project area on which Crossroads has built, and is building, residential housing units.

Some of the policies and provisions in the Housing Acts are these:

a. private enterprise is to be encouraged to meet as much as possible of the housing need (e.g., 42 U.S.C. § 1441);

b. capital grants are to be made by the federal government only to a "local public agency" (42 U.S.C. § 1455);

c. a specified part of the housing units must be for "low and moderate income families or individuals" (42 U.S.C. § 1455(f); this must mean that the balance may be luxury type units for those with higher incomes); and

d. when real property in the project area is sold for redevelopment, the purchaser must undertake certain specified obligations (42 U.S.C. § 1455 (b)).

Effective in 1961, the New York legislature passed the "urban renewal law" (General Municipal Law, McKinney's Consol.Laws, c. 24, § 500 and following) and effective in 1962 the legislature passed the "urban renewal agency act" (General Municipal Law § 550 and following). These laws were intended in part to insure coordination with the federal government.

The City developed an urban renewal plan for the Project here and made contracts for capital grants with the federal and the state governments.

Effective April 23, 1964, the legislature established defendant Peekskill Urban Renewal Agency (General Municipal Law § 576) for the purposes specified in the urban renewal agency act.

On December 27, 1965, the City and the Agency made a "cooperative agreement" so that the Agency might go forward with the Project in place of the City.

The Agency by contracts obtained capital grants for the Project from the federal and state governments.

The Agency obtained title to all land in the Project area by purchase or by condemnation (General Municipal Law § 555).

The City and the Agency proposed to sell to Crossroads part of the land in the Project area for redevelopment by Crossroads with apartment housing units, unrestricted as to rental prices. Such a sale is permitted, under certain conditions, by New York General Municipal Law § 507(2) (c) and is contemplated by the federal housing statutes (42 U.S.C. § 1455(b)). The Agency designated Cross-

roads as a "qualified and eligible sponsor" and the City approved (General Municipal Law § 507(2) (c)).

According to the complaint, the Agency sold to Crossroads the land on which the "Crossroads" apartments are being built. The "negotiated" sale price is said to have been $182,100.

By contract, dated November 25, 1968, the Agency agreed to convey to Crossroads the title to the land on which the "Crossroads" apartments are built. Because the land so to be conveyed was part of an urban renewal project, Crossroads was required by federal and state statutes, the more important of which have already been cited, to undertake certain obligations in the contract.

During the time period before completion of the improvements by Crossroads on the land, there were extensive controls by the Agency in the contract over the design of the housing units, manner of construction, and the like as well as controls in this period over assignment of the contract, sale of the land, change of ownership, and the like.

There was a section of the contract (Sec. 8C.) "State Equal Opportunity in Construction Employment" which seems to apply to the construction period. Crossroads agreed specifically not to discriminate in employment "because of race, creed, color or national origin" and to include similar provisions in all subcontracts and purchase orders. Crossroads agreed to comply with Sections 291–299 of the Executive Law of New York, McKinney's Consol.Laws, c. 18. These deal with "employment without discrimination" (Executive Law § 291 (1)) but also deal with a civil right to "use and occupancy of housing accommodations * * * without discrimination because of race, creed, color or national origin" (Executive Law § 291(2)). Crossroads agreed to comply with the Civil Rights Law of New York. Among other things, this makes it unlawful for the owner of any "publicly assisted housing accommodation" to refuse to rent to any person "because of the race, color, religion, national origin or ancestry of such person" (Civil Rights Law, McKinney's Consol.Laws, c. 6, § 18–c(1)). Crossroads is within the definition of "publicly assisted housing accommodation" (Civil Rights Law § 18–b(3) (c)). Crossroads agreed to make reports and permit access to its books to insure compliance with nondiscrimination clauses.

There were further agreements in the contract that Crossroads in renting would not discriminate on the basis of "race, color, creed, or national origin".

There were no controls over the rentals to be charged or the selection of tenants, other than those as to discrimination just described.

It appears from papers obligingly submitted by counsel for plaintiffs that a deed to part of the land for "Crossroads" was executed by the Agency under date of February 21, 1969 and was properly recorded thereafter. This deed, by its acceptance, involves a covenant by Crossroads not to discriminate in renting on the basis of "race, color, creed, or national origin".

It may be assumed that the balance of the land for "Crossroads" will, in the fullness of time, be deeded by the Agency with similar covenants.

It appears that a "certificate of completion" of the improvements by Crossroads has been executed by the Agency and duly recorded.

The complaint avers (para. IV, 93) "upon information and belief" that there is some understanding between the City "and/or" the Agency and Crossroads that welfare recipients will be rejected as applicants for, or tenants of, the "Crossroads" apartments. The answers deny this. The opposing affidavits deny this. Plaintiffs have presented no evidence in support of the averment and it must, therefore, be disregarded for present purposes.

There is no agreement by Crossroads with the Agency or anyone else as to the amount of rent to be charged or as to what tenants are to be accepted or considered. There is the contract provision, already noted, that there will be no dis-

crimination in leasing because of race, etc., but certainly no claim can be made that there has been any discrimination in leasing against Negroes. Indeed, it appears without dispute that more than one-third of the present tenants are Negro families.

Crossroads as a private enterprise has fixed its rents, negotiated with prospective tenants, accepted applications, and made leases. The state has had nothing whatever to do with these operations.

There is no tax exemption, tax abatement, or any other tax benefit to Crossroads. Real estate and other taxes are paid on the same basis as everybody else in Peekskill. Undoubtedly the amount of taxes required to be paid by Crossroads is reflected in the rentals charged for its apartments.

It does not appear that the construction and operation of the "Crossroads" apartments has been financially aided by any governmental agency, state or federal. It appears to have been completely a private enterprise, financed privately.

B. Rental Prices and Policies of Crossroads; Limits on Shelter Allowances to Welfare Recipients

The papers show that the rents for apartments at "Crossroads" per month are as follows:

2½ rooms (studio; no
 bedroom) $145
3½ rooms (1 bedroom) $155 to $185
4½ rooms (2 bedrooms) $198 to $203

It also is beyond dispute that Crossroads requires a deposit of $50 with each application, the deposit being returned if "credit references or other information concerning the tenant prove unsatisfactory". (Exhibit A to David Bogdanoff affidavit of September 25, 1970). Crossroads further requires that it be satisfied of the ability of an applicant to pay the rent; there is a security deposit of one month's rent when the lease is signed, together with payment of rent for one month in advance.

Welfare recipients in Peekskill are given an allowance for shelter up to a maximum. After increases effective July 1, 1970, the maximum allowances as rent per month are as follows:

| | |
|---|---|
| 1–2 rooms (studio) | $135 |
| 3–4 rooms (1 bedroom) | $140 |
| 5 rooms (2 bedrooms) | $170 |

Thus the rent at Crossroads is more than the maximum allowance of public assistance, the excess amounts being from $10 to $45 per month. This was known to the management of Crossroads.

It is not shown by plaintiffs that any of them could tender to Crossroads the $50 required with an application. It is claimed (Supplemental Memorandum for plaintiffs, pp. 16–17) that the applicable regulations, not specific on the point, would permit public assistance moneys for this purpose. On the other hand, Allen, the Westchester County official in charge, testified on deposition (September 25, 1970; p. 7): "Application deposits are not on the list of things included [in the welfare regulations]".

It does appear that public assistance moneys would be supplied in appropriate cases for the security deposits required by Crossroads.

It is also clear, as shown above, that the maximum allowance for shelter to welfare recipients is less than the rents at Crossroads.

There is a procedure, however, by which a welfare recipient may secure a shelter allowance above the maximum allowances in welfare regulations. The caseworker at Peekskill must first approve the excess rent payment; then a form 664 must be completed, showing why the excess payment is required, including that the present housing is hazardous or unsuitable; this form 664 is forwarded to the supervisor and, if approved, is sent to the Westchester County welfare administration at White Plains. Final approval is a matter within the discretion of the county administration. Allen, the welfare official quoted above, is on record that approval is given "only in the unusual situation" (Exhibit B to David Bogdanoff affidavit of September 25, 1970). Allen also testi-

fied by deposition that the purpose of requiring specific approval for excess rentals was "to keep down the expenditure for the item of rent", that the welfare administration was "not anxious to approve excess rentals and would not approve them where the person has adequate housing suitable to his needs". Between January 1 and August 31, 1970 excess rent was approved in 804 cases in Westchester County, of which 34 were in Peekskill.

No plaintiff in this action has ever attempted to secure approval for payment of the rentals charged by Crossroads. It is claimed that the welfare authorities will not consider approving a form 664 excess rent application unless the welfare recipient has already been firmly offered a specific apartment by the landlord; it is suggested that since Crossroads will not accept applications from welfare recipients, no apartment at "Crossroads" will ever be offered to a welfare recipient and thus no excess rent approval can ever be submitted to the welfare authorities.

The record does not make clear whether the welfare authorities in Westchester County would consider a form 664 unless there had been a firm offer of a specific apartment at a specific rental. At one point (deposition October 9, 1970 pp. 31–32) Allen appears to say that if the landlord requires proof of financial ability to pay the rents before promising an "available" apartment to a welfare recipient, then the welfare authorities will consider approving payment of excess rent for that recipient.

The record is clear that the refusal of Crossroads to accept applications from welfare recipients is based *solely* on a belief that they are unable to pay the rents. If any welfare recipient could show an ability to pay the rents—either because of excess rent approval by the welfare authorities or otherwise—it is certain that Crossroads would treat the application exactly like all others similarly situated. The distinction is not based on some believed social or moral inferiority from the fact of receipt of public

assistance; the distinction is based on believed inability to pay.

C. Claimed Injury to Plaintiffs

Accepting the statements of plaintiffs as true, their situation appears to be as follows:

As to plaintiff Male (a white person), she was told about July 6, 1970 by a renting agent that Crossroads did not take welfare recipients in the apartments. She wanted to apply for a two bedroom apartment for herself and two children. The renting agent would not give her an application. She is satisfied with her present shelter for which she pays $170 per month rent from public assistance. Her sublease expires in December but inability to make a new lease is not shown.

As to plaintiff Murray, she was told by a "young lady" at Crossroads on July 16, 1970 that welfare recipients were not allowed by the City to be accepted as tenants of the apartments. She has three children, ages 7, 5 and 2. She tried to apply for a two bedroom apartment at Crossroads. Her present rent is $135 per month, paid by public assistance, and she has lived about a year in the present apartment. She says that there are "inadequate heating, plumbing and electrical facilities" there.

As to plaintiff Horne, she was told by Mr. Curry at Crossroads on about July 20, 1970 that welfare recipients could not live at Crossroads because of an agreement with the City. She has one son, aged 16. She does not say for what size apartment she wished to apply but it could only have been a two bedroom apartment. She has a four room apartment at present, said to be "very poor", for which she pays $80 per month from public assistance.

As to plaintiff Sherroll, apparently living alone, she filled out an application for a one bedroom apartment at Crossroads on about June 26, 1970 but was told that the application could not be accepted because of a policy of Crossroads not to accept welfare recipients. Where this plaintiff has been living since July

28, 1970 does not appear but there is no claim that it is inadequate; all that is said by this plaintiff is that for "personal reasons" she would prefer to live at Crossroads.

As to plaintiff McDowell, she is an unmarried student. She asked for a studio apartment at Crossroads on July 17, 1970; she was told by Mr. Curry that, under a contract with the City of Peekskill, Crossroads did not rent to welfare recipients. She presently pays $85 per month rent for an apartment which she says is "adequate" and that she is satisfied with it.

## I. Lack of Jurisdiction of The Action

 Whether there is jurisdiction depends on whether "state action" is shown in respect of the claimed refusal by Crossroads to accept relief recipients.

That "state action" must be shown was established by the *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Although puzzling why it should be done, this requirement is treated as jurisdictional rather than as one of sufficiency of claim or proof. Hodges v. United States, 203 U.S. 1, 20, 27 S.Ct. 6, 51 L.Ed. 65 (1906); Powe v. Miles, 407 F.2d 73, 79–80, 85 (2d Cir. 1968); Grossner v. Trustees of Columbia University, 287 F. Supp. 535, 546 (S.D.N.Y. 1968).

 As in other respects, counsel for plaintiffs submit a thoroughly professional and an able argument on the point. Counsel for defendants do not discuss the point and at oral argument appeared to concede it. Lack of subject matter jurisdiction cannot be waived, however, and the Court must decide whether "state action" is present.

The case at bar is by no means such a situation as that in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) where "state action" was found by five members of the Court.

 The fact pattern here is entirely different from that in *Burton*. Under the circumstances here shown, there does not appear to be "state action" so as to give this Court jurisdiction to entertain a claim under 42 U.S.C. § 1983 or the other civil rights sections of that Title. Plaintiffs complain of discrimination against welfare recipients as "based on wealth" (Memorandum, p. 26) but the state has nothing whatever to do with any investigation by Crossroads of the financial ability of its prospective tenants or any attitudes of Crossroads "based on wealth". Plaintiffs cite a study showing that under the Aid for Dependent Children program of the federal government, 46.2% of the family recipients (nationally) are Negro. This will support no inference that the attitude of Crossroads toward welfare recipients in Peekskill is based on race. The contrary is affirmatively established by the fact that more than one-third of the tenants of Crossroads are black. It may also be noted that one of the plaintiffs is white. The discrimination at issue is definitely not racial.

There is undoubtedly an extensive state involvement in the Project here— its planning, its execution, and its continued existence. There are also state controls over the land area transferred to Crossroads, for example, the control over racial discrimination. But the involvement by the state and the matters over which the state has control are *not* those of which plaintiffs complain. Their argument "overlooks the *essential* point— that the state must be involved not simply with *some* activity of the institution alleged to have inflicted injury upon a plaintiff but with *the* activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of complaint". Powe v. Miles, above cited at 81, emphasis supplied; see also Grossner v. Trustees, etc., above cited at 548.

Plaintiffs properly rely on Smith v. Holiday Inns, 336 F.2d 630 (6th Cir. 1964). The facts are indeed very close to those at bar. There are some significant differences. In the *Smith* case, there was admitted and flagrant racial discrimination. Were this shown here, the state could easily enforce its covenant

with Crossroads. In the *Smith* case, there was a restrictive covenant against any "lease, conveyance" etc. on the basis of "race". Whether this was being violated by the motel defendant is not clear; in any event, the state was involved in the covenant and arguably it was being violated but the state was doing nothing to test whether there was a violation. If these distinctions be not valid, then the *Smith* decision will not be followed by this Court.

In considering such cases as Smith v. Holiday Inns, there is an argument or suggestion of Judge Friendly that "racial discrimination is so peculiarly offensive and was so much the prime target of the Fourteenth Amendment that a lesser degree of involvement may constitute 'state action' with respect to it than would be required in other contexts * * *." (Coleman v. Wagner College, 429 F.2d 1120, 1123 (2d Cir. 1970)).

Hampton v. City of Jacksonville, 304 F.2d 320 (5th Cir. 1962) has been considered and rejected as authority here; in *Hampton* there are many significant differences on the facts from the case at bar.

The facts in Colon v. Tompkins Square Neighbors Inc., 294 F.Supp. 134 (S.D. N.Y. 1968) are also very different, especially since the "daily operations" of the apartments there were ultimately supervised by a state agency.

It is concluded that there is no jurisdiction to issue a preliminary injunction for any violation of the civil rights laws.

II. The Classification Made by Crossroads Does Not Violate Any Constitutional Right of Plaintiffs

Assuming that, contrary to the conclusion reached, "state action" is shown in respect of the rental policies of Crossroads, no preliminary injunction should issue because no constitutional violation is made to appear.

■■ A classification or discrimination or distinction is not of itself in violation of the equal protection clause. There is a "proper basis" for the classi-

fication if it rests "upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis". Gulf, Colorado & S. F. Ry. Co. v. Ellis, 165 U.S. 150, 155, 17 S.Ct. 255, 257, 41 L.Ed. 666 (1897).

■ Crossroads refuses to accept applications from welfare recipients because, as such, they are unable to satisfy Crossroads that they can pay the rent.

The classification of Crossroads is reasonable and not arbitrary. It is offering apartments for rent at prices which are the same for all. Surely it has a right to refuse applications from welfare recipients on the ground that, by definition, they cannot pay the rentals required. The landlord must be able to satisfy himself of the credit standing of the prospective tenant. These plaintiffs depend entirely upon public assistance; they have no other income. At the time they sought to apply for apartments at Crossroads, they did not and could not show that they could pay the rentals required. The contrary was evident because the rentals were in excess of the maximums allowed to welfare recipients.

■ Plaintiffs point out that they *might* be able to obtain a special approval from the welfare authorities for payment of rent to Crossroads in excess of the prescribed welfare maximums. If they obtain such approval, it is certain that Crossroads would then consider their applications. They say, however, that the welfare authorities will not *consider* a request for excess rent approval unless Crossroads has accepted an application and has guaranteed a specific apartment to the applicant *if* the welfare authorities approve the excess rent required. Nothing in the equal protection clause puts such a burden on the landlord. In effect, the demand is for a free option on an apartment at Crossroads for an indefinite period while the welfare authorities consider the matter. No such option, free or otherwise, is presently offered by Crossroads and to direct it by

injunction would result in an unfair and unreasonable discrimination against those who are not welfare recipients.

### III. No Irreparable Injury is Shown

As to two of the plaintiffs (Male and McDowell), it affirmatively appears from their depositions that they are satisfied with their present housing.

As to plaintiff Sherroll, she did not testify by deposition or otherwise. Neither in her moving affidavit nor in the complaint is it made to appear that her present housing is inadequate, much less hazardous to health. All she says is that for "personal reasons" she would "prefer" to live at "Crossroads".

As to plaintiff Murray, she says that her present housing is "inadequate".

As to plaintiff Horne, she testified by deposition that her present housing was "very poor".

There is thus no showing of irreparable injury as to any plaintiff.

It also appears affirmatively from the deposition of Allen that in the case of welfare recipients, the welfare authorities will not consent to occupancy of premises which are "a hazard or threat to the safety or health of the children or recipients" and that, before allowing shelter assistance, the welfare authorities satisfy themselves that there are no building violations against the premises occupied.

### IV. No Basis for Class Action

■ The class is said to consist of all those recipients of public assistance who have on that account been denied housing at "Crossroads" or have been deterred from applying for housing there because of knowledge of the policy to refuse welfare recipients.

Assuming—but without deciding—that such would be a proper class, there is no showing of any sort as to how many members of the class there are. There are conclusory averments that the members of the class are "numerous". This is not sufficient. There are no *facts* averred, much less established, on the issue whether "the class is so numerous that joinder of all members is impracticable". Fed.R.Civ.P. 23(a) (1). The motion in this respect must therefore be denied. Demarco v. Edens, 390 F.2d 836, 845 (2d Cir. 1968).

■ A preliminary injunction "is an extraordinary remedy, and will not be granted except upon a clear showing of probable success *and* possible irreparable injury." Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969; emphasis in original).

The motion for a preliminary injunction is denied.

The motion for an order that this may be maintained as a class action is denied.

So ordered.