Patricia **MALE** et al., Plaintiffs,

v.

**CROSSROADS ASSOCIATES** et al.,
Defendants.

No. 70 Civ. 3509.

United States District Court,
S. D. New York.

Oct. 29, 1971.

See also D.C., 320 F.Supp. 141.

Legal Aid Society of Westchester County, White Plains, N. Y., John T. Hand, Martin A. Schwartz, White Plains, N. Y., of counsel, for plaintiffs.

Robinson, Silverman, Pearce, Aronsohn & Sand, New York City, Barry I. Fredericks, New York City, of counsel, for Crossroads Associates and David and Muriel Bogdanoff.

Greenspan, Aurnou & Davis, White Plains, N. Y., Joel M. Aurnou, White Plains, N. Y., of counsel, for City of Peekskill, DiBart and Agency.

MEMORANDUM

TENNEY, District Judge.

The plaintiffs in the instant case are four female recipients of public assistance from the Department of Social Services of Westchester County.[1] Defendant Crossroads Associates is a partnership organized under the laws of the State of New York which owns and operates a residential project in Peekskill New York, known as "The Crossroads", situated on a part of the so-called "Academy Street Urban Renewal Area". Defendants David and Muriel Bogdanoff are being sued individually and as partners doing business under the name of Crossroads Associates. Defendant City of Peekskill (hereinafter referred to as the "City") is one composed of approximately 4,600 families, of which, according to the 1960 United States Census, some 600 live in abject poverty. Defendant Michael J. DiBart is Mayor of the defendant City and Chairman of the City's Urban Renewal Agency. Mayor DiBart is being sued in his official capacities. Defendant Peekskill Urban Renewal Agency (hereinafter referred to as the "Agency") consists of the defendant Mayor and the six members of the Common Council of the City of Peekskill, and was established by N.Y. General Municipal Law § 576 (McKinney's Consol.Laws, c. 24 (1965)) for the purposes provided in Articles 15 and 15–A of that law (known as the "New York Urban Renewal Law") and Article 18 of the Constitution of the State of New York. This case comes before the Court on motions for summary judgment by all parties pursuant to Fed.R.Civ.P. 56.

Briefly, each of the plaintiffs alleges that in July 1970 she inquired at The

---

1. Plaintiff McDowell is 25 years of age, single, a student, and has no dependents. Plaintiff Male has a daughter two years of age and a new-born child. Plaintiff Murray has three daughters, aged seven, five and two. Plaintiff Horne has one dependent-age 16.

Crossroads rental office, either in person or by telephone, as to the availability of an apartment. Each of the plaintiffs, upon disclosing that she was a recipient of public assistance, was advised by a Crossroads rental agent either that Crossroads simply did not rent to welfare recipients, or that pursuant to an agreement between Crossroads and the City, Crossroads did not rent to welfare recipients.[2] None of the plaintiffs was allowed even to apply for an apartment, nor were any of them informed that there was a $50 application fee, returnable to the applicant if The Crossroads management could not accommodate her with an apartment, or applicable to the first month's rent if the applicant were accepted by the management.

Plaintiffs submit that, due to the public nature and function of The Crossroads as part of Peekskill's urban renewal plan, defendants Crossroads Associates and David and Muriel Bogdanoff are subject to the mandates of the thirteenth and fourteenth amendments to the United States Constitution and to 42 U.S.C. §§ 1981, 1982, 1983 and 1985. Thus, plaintiffs charge that the defendants' practice of excluding applicants for accommodations at The Crossroads on the basis of their status as welfare recipients violates plaintiffs' rights under the equal protection clause of the fourteenth amendment, the thirteenth amendment, and 42 U.S.C. § 1982. Plaintiffs charge additionally that the alleged agreement between the defendant City and defendants David and Muriel Bogdanoff, whereby welfare recipients are denied admit-

tance to The Crossroads, serves to deprive them of their rights as guaranteed by the thirteenth and fourteenth amendments and 42 U.S.C. §§ 1981, 1982, 1983 and 1985. Plaintiffs, in general, demand an injunction restraining defendants from denying them housing accommodations in The Crossroads on account of their status as recipients of public assistance and mandating that defendants offer plaintiffs applications for apartments in The Crossroads upon the same terms and conditions as are applied to those who are not recipients of public assistance, and for other affirmative relief. Plaintiffs further demand money damages in the amount of $15,000 each for plaintiffs McDowell, Murray and Horne, and $5,000 for plaintiff Male, plus costs and disbursements.

In answer to the charges made by plaintiffs, Crossroads Associates and the Bogdanoff defendants deny that they have a policy against admitting welfare recipients to The Crossroads and deny that they have an agreement with the City relating to the admission of welfare recipients to The Crossroads. They say they have no knowledge sufficient to form a belief as to whether their rental agents, who, in fact, appear to have been their two daughters and a Mr. Roger Curry, a young man of college age at the time the cause of action arose (see Deposition of David Bogdanoff at 31–32), had made the statements alleged by the plaintiffs. The Bogdanoffs insist that the only standard which they apply to prospective tenants of The Crossroads is an economic one, *i. e.*, that they be able

---

2. Plaintiff McDowell was told by a Mr. Curry that pursuant to a contract between Crossroads and the City, Crossroads did not rent to welfare recipients. Affidavit of McDowell ¶ 7.

Plaintiff Male was advised by a rental agent, a man, that he could not give her an application since she received public assistance. Deposition of Male at 12.

Plaintiff Murray was advised by a Crossroads rental agent, a woman, that Crossroads did not accept welfare recipients as tenants because the City did not allow Crossroads to accept welfare recipients. Affidavit of Murray ¶ 7.

Plaintiff Horne was informed by a rental agent, Roger Curry, that Crossroads could not allow welfare recipients to live there due to an agreement between Crossroads and City officials, including the Mayor, and that the City could sue Crossroads were the latter to allow welfare recipients to reside at the project. Plaintiff Horne was further advised by Mr. Curry to address any further questions relative to the matter to the Mayor of Peekskill. Affidavit of Horne ¶ 6.

to pay the rent, and they allege that the rents charged at The Crossroads are over and above those allowed by the Westchester Department of Public Assistance to those receiving welfare payments. Moreover, the Bogdanoff defendants claim that The Crossroads was privately financed and is at present privately owned and operated, and thus its admissions policies are not subject to the mandates of the thirteenth and fourteenth amendments and 42 U.S.C. §§ 1981, 1982, 1983 and 1985, since that state action necessary to give the federal courts jurisdiction is not present. The Bogdanoffs further deny that the defendant City or its officials exercise any control whatsover as to which applicants are accepted at The Crossroads and deny the existence of any agreement or understanding between them and the City as to the ethnic or economic composition of The Crossroads' tenants.

The defendant City, Agency and Mayor likewise deny the existence of any agreement between them and The Crossroads as to whom the Bogdanoffs are required to admit as tenants. All defendants further assert that the determinations made by Judge Wyatt in denying the plaintiffs' motions to proceed as a class action and for a preliminary injunction (see Male v. Crossroads Associates, 320 F.Supp. 141 (S.D.N.Y.1970)), are now the law of the case and as such bind this Court in deciding the present motions for summary judgment.

■ To dispose of the last point at the outset, it is well settled that a decision granting or denying a motion for a preliminary injunction does not finally determine the merits of the case, either as to factual issues or legal conclusions. Public Service Commission of Wisconsin v. Wisconsin Telephone Co., 289 U.S. 67, 70, 53 S.Ct. 514, 77 L.Ed. 1036 (1933); Imperial Chemical Industries Ltd. v. National Distillers & Chemical Corp., 354 F.2d 459, 463 (2d Cir. 1965); Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742–743 (2d Cir. 1953); Citizens Committee for Hudson Valley v. Volpe, 302 F.Supp. 1083, 1088

n. 2 (S.D.N.Y.1969), aff'd, 425 F.2d 97 (2d Cir. 1970), cert. denied, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970); Afran Transport Co. v. National Maritime Union, 175 F.Supp. 285, 287 (S.D. N.Y.1959); Harvey Aluminum Inc. v. American Cyanamid Co., 15 F.R.D. 14, 20 (S.D.N.Y.1953); Reeber v. Rossell, 106 F.Supp. 373, 375–376 (S.D.N.Y.), modified, 200 F.2d 334 (2d Cir. 1952); 1B Moore, Federal Practice, ¶ 0.404, p. 572. The rationale of such a rule lies in the fact that "a preliminary injunction . . . is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness." Hamilton Watch Co. v. Benrus Watch Co., supra, 206 F.2d at 742. Since the time plaintiffs' motion for a preliminary injunction was denied, they have submitted additional affidavits, depositions and briefs which may well affect the final outcome of the case.

■ This Court's first inquiry must be as to whether such state action is present as to give it jurisdiction to hear the claims asserted by plaintiffs under the thirteenth and fourteenth amendments and 42 U.S.C. §§ 1981–1983. I conclude that such state action is present. If it is found that an agreement exists between the defendant City and the Bogdanoffs, the existence of state action is, of course, clear, since the City itself would be directly involved in any discrimination being practiced. What is less clear, however, is whether, if no conspiracy is found between the City and the Bogdanoffs, state action exists such as to give plaintiffs a cause of action against The Crossroads and the Bogdanoffs. The crux of the Bogdanoffs' defense as to this issue is that, although The Crossroads is built on land which is part of the Peekskill Academy Street Urban Renewal Area, Crossroads Associates is a private developer which purchased the land from the defendant City at the going market price and which has received no tax or other benefits to render it a project in which the state is involved.

The concept of state action is constantly in flux. Black, "State Action", Equal Protection and California's Proposition 14, 81 Harv.L.Rev. 69 (1969). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). *Burton* involved a situation where a private restaurateur leased premises in a building constructed on land acquired through exercise of the power of eminent domain by the Wilmington Parking Authority. The Court held that such state action existed as to render the restaurateur subject to the mandates of the fourteenth amendment and held the restaurateur's refusal to serve black persons a violation of equal protection. Similarly, in Smith v. Holiday Inns of America, Inc., 220 F.Supp. 1 (M.D.Tenn.1963), aff'd, 336 F.2d 630 (6th Cir. 1964), the court, following *Burton*, found that a Holiday Inn, although privately-owned and operated, had been built pursuant to an urban renewal plan and thus held that it was required to accommodate guests without regard to race or color under 42 U.S.C. §§ 1981–1983 and 28 U.S.C. § 1343(3). A "sifting of the facts" in *Smith* revealed that state action was present in three significant respects: (1) the federal, state and city funds employed and the governmental benefits that accrued to the motel, (2) the pervasive federal and state regulatory scheme governing the motel's activities and (3) the public nature of the motel as part and parcel of the urban renewal plan. The *Smith* court concluded:

> "The single pervasive fact . . . is that this motel is part and parcel of a large, significant, and continuing public enterprise—the Capitol Hill Redevelopment Project. This motel was conceived by the planners of this project, its creation was made possible by the execution of the project and its existence is now governed to a great

degree by the project's predetermined design and controls." 336 F.2d at 634.

The facts presented in the instant case bear a remarkable similarity to those presented in *Smith*. Therefore, I find that a sifting of the facts in the instant case reveals the existence of state action by virtue of (1) the use of public funds and the public benefits accruing to defendant Crossroads Associates, (2) the pervasive federal and state statutory and regulatory scheme governing the activities of Crossroads Associates, and (3) the public nature of The Crossroads as part of an urban renewal program. I shall analyze each of these aspects in detail.

First, as to the use of public funds and government benefits accruing to defendant Crossroads Associates, it appears that the federal, state and local governments have expended large sums of money in order to carry out the Peekskill urban renewal program. The "net project cost" (the total project cost minus proceeds from the sale of land to private developers) is borne two-thirds by federal grant and one-third by state and local grants. See 42 U.S.C. §§ 1441 et seq. (1964); N.Y. General Municipal Law Articles 15 & 15–A (McKinney 1965). The land upon which The Crossroads is built was acquired originally by the City of Peekskill by exercise of the power of eminent domain and expenditure of public funds. 42 U.S.C. § 1460(c) (1) (1964); N.Y. General Municipal Law §§ 554(6), 555 (McKinney 1965). Additional moneys have been spent by governmental authorities to demolish, clear and improve the land. 42 U.S.C. § 1460(c) (1964); N.Y. General Municipal Law §§ 503, 554(14) (McKinney 1965). The contract of conveyance between the defendant Agency and Crossroads Associates obligates the Agency to perform certain functions for the benefit of and without expense to Crossroads Associates. These obligations on the part of the Agency include, *inter alia*: demolishing and removing buildings on the property; breaking cellar floors so as to

permit proper drainage; removing all pavement and public utility lines; filling, grading and leveling the land; paying all expenses, including current taxes, related to the demolished buildings; closing and vacating all existing streets and alleys and other public rights of way within or abutting on the property; resurfacing, rebuilding or constructing alleys or other public rights of way; constructing and dedicating new streets, alleys and public rights of way; installing public sidewalks and sodding and seeding specified areas; installing street lighting, signs and fire hydrants; installing or relocating sewers, drains, water and gas, telephone and telegraph, and other public utility lines; and providing for supporting parking facilities. Furthermore, large amounts of public funds have been expended to comply with the statutory command to provide for the adequate relocation of displacees. 42 U.S.C. § 1455(c) (1964); N.Y. General Municipal Law §§ 503(i), 505(4) (e) (McKinney 1965).

Second, state regulation and control of an otherwise private activity may be so pervasive as to constitute state action. Public Utilities Commission of District of Columbia v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); Irvis v. Scott, 318 F.Supp. 1246 (M.D. Pa.1970), prob. juris, noted *sub nom.* Moose Lodge No. 107 v. Irvis, 401 U.S. 992, 91 S.Ct. 1236, 28 L.Ed.2d 529 (1971). And in Seidenberg v. McSorleys' Old Ale House, Inc., 308 F.Supp. 1253 (S.D.N.Y.1969) and 317 F.Supp. 593 (S.D.N.Y.1970), this Court relied on New York State's pervasive regulation and control over those licensed to sell alcoholic beverages in finding the actions of a private owner of a bar to be state action. In the context of urban renewal, a review of the federal and state regulatory scheme clearly shows that governmental regulation and control of urban renewal programs is so pervasive as to itself constitute a sufficient basis for a finding of state action with respect to any operation which is an integral part

of an urban renewal program. Smith v. Holiday Inns of America, *supra,* 336 F.2d at 635. Detailed regulatory provisions are set forth in 42 U.S.C. §§ 1441 et seq., in the Urban Renewal Handbook issued by the Department of Housing and Urban Development, in Articles 15 and 15A of the N.Y. General Municipal Law and Part 18 of Title 9(c) of the Official Compilation of Codes, Rules and Regulations of the State of New York. Although the policy of the United States and the State of New York is to encourage private enterprise to serve as large a part of the total need of urban renewal as possible, 42 U.S.C. § 1441 (1964); N.Y. General Municipal Law § 501 (McKinney 1965), the statutory and regulatory scheme clearly requires that private developers act in conformity with and pursuant to the federal and state regulations and objectives. For example, an urban renewal plan must conform to a comprehensive community plan for the physical and social development of the municipality as a whole, and it must be consistent with local objectives. 42 U.S.C. § 1455(a) (1964); N.Y. General Municipal Law § 502 (McKinney 1965). The acquisition of urban renewal property by private developers is governed by myriad regulations to ensure that the grantee will "redevelop such property in accordance with the urban renewal plan" and to ensure that "the use of such real property [is] for purposes consistent with such urban renewal plan." N.Y. General Municipal Law §§ 507(3), 556 (3) (McKinney 1965); 42 U.S.C. § 1455 (b) (i) (1964). In the contract of conveyance itself between the City and the private developer there is a provision which states:

"[I]n view of:

(a) the importance of the redevelopment of the Property to the general welfare of the community; [and]

(b) the substantial financing and other public aids that have been made available by law and by the Federal and local Governments for

the purpose of making such redevelopment possible;

.　　.　　.　　.　　.　　.

the qualifications and identity of the Redeveloper, and its stockholders, are of particular concern to the community and the Agency." See Contract, Part II, Article V, § 501.

The conclusion, therefore, is inescapable that the state is vitally concerned with the use and operation of property that is part of an urban renewal project, since federal and state urban renewal policies cannot be effectively implemented unless private enterprise involvement in urban renewal is consistent with such policies.

■ Third, I find that state action exists by reason of the fact that urban renewal is inherently a public function. See Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). Without the expenditure of enormous amounts of government funds, both federal and state, urban renewal, as it is commonly conceived, would not exist. The fact that The Crossroads is privately owned, therefore, does not settle the question of state action. And, in fact, the Supreme Court has ruled that where, as in the instant case, the operations in question are essentially a public function and are subject to state regulation, private ownership of one part of the operations is not controlling:

"We do not agree that the corporation's property interests settle the question. . . . Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." Marsh v. Alabama, *supra* at 505–506, 66 S.Ct. at 278.

■ One last point remains as to state action. Judge Wyatt, in denying plaintiffs' motion for a preliminary injunction, relied extensively upon Powe v. Miles, 407 F.2d 73 (2d Cir. 1968) to find that no state action existed in the instant case because the state was not "directly" involved in the challenged activity. With all due respect, I find that reliance on *Powe* is misplaced. The activity in *Powe* —higher education—was an essentially private one which happened to benefit from the receipt of some public funds. Here, we have an essentially public activity—urban renewal—the particular aspect with which we are concerned just happening to be privately owned. The Supreme Court has recognized this distinction:

"This is not to say, however, that the involvement of the State need be either exclusive or direct. In a variety of situations the Court has found state action of a nature sufficient to create rights under the Equal Protection Clause even though the participation of the State was peripheral, or its action was only one of several co-operative forces leading to the constitutional violation." United States v. Guest, 383 U.S. 745, 755–756, 86 S.Ct. 1170, 1177, 16 L.Ed.2d 239 (1966).

And in analyzing its decision in Burton v. Wilmington Parking Authority, *supra*, the Supreme Court stated:

"Although the State neither commanded nor expressly authorized or encouraged the discriminations, the State had 'elected to place its power, property and prestige behind the admitted discrimination' and by 'its inaction . . . has . . . made itself a party to the refusal of service . . .' which therefore could not be considered the purely private choice of the restaurant operator." Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 1633, 18 L.Ed.2d 830 (1967), *quoting* Burton v. Wilmington Parking Authority, *supra*, 365 U.S. at 725, 81 S.Ct. at 862.

Therefore, where, as in the instant case, there is extensive government involvement in a particular activity which is itself a public function, it is not necessary for the state to be involved directly in the very discriminatory act alleged. It is enough that the state would allow such discrimination to be practiced under

its imprimatur. Burton v. Wilmington Parking Authority, *supra*.

██ Since the existence of state action is clear in the case at bar, this Court's next inquiry must be as to whether plaintiffs have been denied the equal protection of the laws by the alleged behavior of the defendants. The usual method to determine whether there has been a violation of the equal protection clause is to apply the "rational basis" test, *i. e.*, whether there is a rational basis for the classification created. Thus, not all discrimination is prohibited under the equal protection clause; to be unlawful, the discrimination must be arbitrary and unreasonable. If it can be shown, therefore, that the classification complained of has a rational relation to the end it seeks to achieve, there would be no finding of a constitutional violation. Here, defendants claim that their refusal to rent to welfare recipients is based upon a reasonable classification: welfare recipients do not receive a large enough rent allowance to afford the rents at The Crossroads. Such an assumption, however, appears to be unfounded. There exists a procedure by which welfare recipients can obtain rent supplements, which, in many cases, would enable them to afford apartments at The Crossroads and, due to the current acute housing shortage in Peekskill for lower income families, it would appear that the granting of such rent supplements is not at all uncommon. *See* Depositions of Bittner and Allen. A welfare recipient cannot apply for a rent supplement, however, unless she can show that she has a specific apartment available for her to rent. Thus, defendants' contention that none of the plaintiffs ever made any attempt to demonstrate that she could afford The Crossroads by applying for a rent supplement is completely specious since defendants allegedly cut off plaintiffs from pursuing this route by denying them the opportunity even to apply for an apartment. Since it appears at this stage of the proceedings that at least some of the plaintiffs might be entitled to rent supplements

enabling them to afford to live at The Crossroads, defendants' alleged denial of applications to welfare recipients as a class would appear to be an impermissibly broad method to effectuate an admittedly legitimate purpose, and is thus violative of the equal protection clause. Colon v. Tompkins Square Neighbors, Inc., 294 F.Supp. 134 (S.D.N.Y.1968).

██ Summary judgment procedure under Fed.R.Civ.P. 56 is available only when there is no genuine issue of material fact. Based on the pleadings, affidavits and depositions of all parties as presented to this Court, I hold that plaintiffs' motion for summary judgment is granted in part and denied in part and that defendants' motion for summary judgment is denied in all respects. Plaintiffs' motion is granted as to defendants Crossroads Associates and David and Muriel Bogdanoff on the ground that these defendants have violated plaintiffs' rights under the equal protection clause of the fourteenth amendment. As to the defendant City of Peekskill, the Urban Renewal Agency and Mayor DiBart, plaintiffs' motion is denied, however, because I find that there is some dispute with regard to material issues of fact.

██ As to the Bogdanoff defendants and Crossroads Associates, it clearly appears that each of the plaintiffs was denied an application to The Crossroads by a Crossroads rental agent solely on the basis of her status as a recipient of public assistance. The Bogdanoffs' only response to plaintiffs' allegations on this issue is that they have no policy against admitting welfare recipients to The Crossroads, and that they have no knowledge or information sufficient to form a belief as to whether or not their rental agents (their two daughters and Mr. Roger Curry) refused to give applications to the plaintiffs. Of course, whether or not the Bogdanoffs have a *policy* relating to the admission of welfare recipients is really not the issue; if their agents refused even to grant applications to welfare recipients the net effect is the same: the plaintiffs are

precluded from obtaining apartments. Therefore, the crucial issue is whether or not The Crossroads rental agents did in fact refuse to allow the plaintiffs to apply for an apartment. It certainly would be a simple matter for the Bogdanoffs to ask their daughters what transpired at The Crossroads rental office when the plaintiffs came in seeking apartments. And if the Bogdanoffs claim that they cannot contact Roger Curry at this late stage of the proceedings, it seems unlikely that they will be able to contact him in the future. See Affidavit of David Bogdanoff, ¶ 8. "A party may not take refuge behind . . . ignorance of the facts in order to raise a material fact issue under Rule 56." Quigley v. Hawthorne Lumber Co., 264 F.Supp. 214, 220 (S.D.N.Y.1967). "While it is true that the initial burden in a motion for summary judgment is on the movant, if the movant supports his position then the respondent must come forward with specific materials of his own to show that there are genuine triable issues of material fact, or he must demonstrate why he cannot do so." Istituto Per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Products, Inc., 47 F.R.D. 310, 317 (S.D.N.Y.1969). The Bogdanoff defendants have failed to meet this burden.

■ As to the defendant City, Agency and Mayor, I find that there are genuine issues of material fact which would preclude the granting of summary judgment. The major issue of fact is whether there exists an agreement among the Bogdanoffs and city officials relating to the exclusion of welfare recipients from The Crossroads. It appears from the depositions and affidavits offered to this Court that a jury might find that such an agreement exists. While all defendants, of course, deny the existence of an agreement, Mr. Bogdanoff's deposition reveals that "Mr. Gibbs [Peekskill's City Coordinator] at one time or another did express a concern that a flood of welfare recipients might take over the entire Crossroads Project which might then have destroyed its effectiveness to the broader community needs . . . ." Deposition of David Bogdanoff at 40. Affidavits also have been submitted which indicate that there may have been a "deal" between city officials and the Bogdanoffs to the effect that "Mr. Bogdanoff would build middle-income apartments which would exclude welfare recipients on condition that the Peekskill City officials would match such middle-income units with low-income units to accommodate the housing needs of the poor." Affidavit of Corona ¶ 2. See also Deposition of Muriel Bogdanoff at 18–19; Deposition of Ornstein at 6–8; Affidavit of Evans ¶ 3; Affidavit of Cohn ¶ 2; Affidavit of Bittner ¶ 2; Affidavit of Singsen ¶ 4; Affidavit of Claytor ¶ 2; Affidavit of Rainey ¶ 2; and Affidavit of Freyer ¶ 6.

Therefore, and for the foregoing reasons, plaintiffs' motion for summary judgment is granted as to Crossroads Associates and David and Muriel Bogdanoff, and these defendants are hereby enjoined from denying plaintiffs accommodations in The Crossroads on the basis of their status as welfare recipients and are required to offer plaintiffs applications for housing accommodations at The Crossroads upon the same terms and conditions as are applicable to all other persons who are not recipients of public assistance. If suitable accommodations at The Crossroads are not available at this time, defendants are required to place plaintiffs on the waiting list in the positions plaintiffs would have held had not their requests for applications been denied on account of their status as welfare recipients. Plaintiffs' motion for summary judgment is denied as to defendant City of Peekskill, the Urban Renewal Agency and Mayor DiBart. As to the issue of damages, a hearing will be necessary to determine what monetary damages, if any, plaintiffs have suffered as a result of the defendants' unlawful conduct. Defendants' motion for summary judgment is hereby denied in all respects.

Submit order on notice in accordance herewith.