**Vasco A. SMITH, Jr., Plaintiff,**

v.

**HOLIDAY INNS OF AMERICA, INC.
and James Dew, Defendants.**

Civ. A. No. 3409.

United States District Court
M. D. Tennessee,
Nashville Division.

July 30, 1963.

Avon N. Williams, Jr., and Z. Alexander Looby, of Looby & Williams, Nashville, Tenn., A. W. Willis, Jr., Memphis, Tenn., and Jack Greenberg, Constance Baker Motley and Frank H. Heffron, New York City, for plaintiff.

William Waller, Jr., of Waller Lansden & Dortch, Nashville, Tenn., and John Dunlap, Memphis, Tenn., for defendants.

WILLIAM E. MILLER, Chief Judge.

This is a class action brought by the plaintiff on behalf of himself and all other Negroes who are similarly situated for declaratory and injunctive relief restraining the defendants from continuing their policy, practice and custom of refusing to accept Negroes as guests at the Holiday Inn-Capitol Hill motel located on James Robertson Parkway in Nashville, Tennessee.

The defendant, Holiday Inns of America, Inc., a Tennessee corporation with its principal place of business in Memphis, Tennessee, is the owner and operator of the motel. The defendant, James Dew, is the manager of the motel and is an employee of the corporation.

On December 4, 1962, plaintiff, through one Carroll Barber, reserved a room at the motel for December 5, 1962. At about 12:30 P.M. on December 5th, plaintiff, accompanied by Barber, entered the motel and informed the desk clerk that he had a reservation. The clerk informed plaintiff that no rooms were available. In answer to plaintiff's inquiry, the clerk stated that it was the management's policy not to serve Negroes. Thereupon, plaintiff and Barber left. A few minutes later a white man, Reverend Robert C. Palmer, entered the motel and, upon inquiry, was informed by the clerk that single rooms were available.[1]

In the present action plaintiff seeks (a) a declaratory judgment that defendants are required by the Fifth and Fourteenth Amendments of the Constitution of the United States to offer accommodations at Holiday Inn-Capitol Hill to plaintiff and other Negroes on the same terms and conditions as they are offered to white persons, (b) a permanent injunction enjoining defendants from denying to plaintiff and other Negroes similarly situated the right to purchase and enjoy accommodations offered at Holiday Inn-Capitol Hill upon the same terms and conditions as are applicable to white persons, and (c) such other relief as may appear to the Court to be equitable. Jurisdiction is properly invoked under 28 U.S.C. § 1343 (3), and 42 U.S.C. §§ 1981, 1982 and 1983.

Holiday Inn-Capitol Hill, hereinafter referred to as the "motel," is located in the Capitol Hill Redevelopment Project, an urban redevelopment project administered by the Nashville Housing Authority and effectuated through the cooperation of other state, federal and local governmental agencies. Lands for the project were acquired by the Housing Authority by direct purchase and by condemnation under its power of eminent domain. Pursuant to the redevelopment plan, the Housing Authority cleared the land, constructed streets and thoroughfares, installed street lights, water mains and other utilities, and completed an elaborate plan of landscaping. Thereafter, in further pursuance of the redevelopment plan, certain parcels, including those upon which the motel now stands, were conveyed to private interests by warranty deeds, but for specific uses and under conditions specified in the conveyances which the Housing Authority determined to be consistent with the redevelopment plan and its purposes, and subject to certain recorded covenants running with the land.

---

1. There is a conflict in the testimony concerning the reason for the desk clerk's refusal to receive the plaintiff as a guest. Plaintiff's testimony, in substance, was that he was turned away with the explanation that the motel did not accept Negroes. The desk clerk testified that he refused the plaintiff accommodations because there were no unreserved rooms available and he could find no reservation on file in plaintiff's name. This conflict in the testimony is immaterial, however, since the desk clerk admitted that he did inform the plaintiff of the motel's policy of excluding Negroes and that plaintiff's reservation would not have been honored if it had been on file.

Plaintiff's position is that the motel is the product of indispensable federal, state and local governmental action, as well as private action, and that the several forms of governmental participation and involvement bring the defendants' activities within the reach of the Fifth and Fourteenth Amendments to the Federal Constitution.

Defendants contend, on the other hand, that the corporate defendant purchased the land in an arm's length transaction and at its full market value; that it erected the building with its own funds and at no cost to the public; that it pays normal ad valorem and other taxes; that the state has no interest in the property and no voice in its management, operation and control; that there is no "state action" involved; and, hence, that their private conduct in the choice of customers is not affected or controlled by the Fifth or Fourteenth Amendments. More specifically, their theory is that all state involvement ended with the execution of the deeds transferring title to Holiday Inns of America, Inc. and the construction of the building in accordance with the specifications and conditions set out in the contract of sale.

If title to the property had in fact been transferred without condition, reservation or restriction, defendants' theory would present the narrow issue whether the city's prior ownership and development of the property constituted state action of sufficient scope and degree to subject successor owners and users to the mandates of the Fifth and Fourteenth Amendments. Such, however, is not the case here. For the Housing Authority, by virtue of the contract of sale, the deeds, and the recorded restrictive covenants running with the land, has retained substantial interests in and controls over present and future uses of the property in order to effectuate and preserve the public purposes for which it was acquired. Those interests and controls, specifically reserved in order to enable the Housing Authority to achieve the objectives of the redevelopment plan, are couched in such broad and imprecise terms that their true significance can be evaluated only from the history of the Project, its purposes, and the methods by which it was carried to fruition.

The Nashville Housing Authority is a public body corporate and politic created pursuant to the provisions of The Housing Authorities Law (Chapter 20, Public Acts of Tennessee, 1935, First Extraordinary Session, as amended; T. C.A. § 13–801 et seq. and § 13–901 et seq.), under which it is vested with full authority to accomplish the purposes and objectives of the law. Among other things, it is authorized (1) to acquire, by eminent domain or otherwise, property in slums and blighted areas which are detrimental to the safety, health, morals, or welfare of the community, (2) to clear the areas acquired and install, construct, or reconstruct streets, utilities, and site improvements essential to the preparation of sites for uses in accordance with a redevelopment plan approved by the governing body of the municipality in which the areas are situated, and (3) to sell or lease land so acquired and improved for uses in accordance with the redevelopment plan.

Prior to the Capitol Hill Redevelopment Project, the Tennessee State Capitol was adjoined on several sides by large slum areas which had an unwholesome effect upon the entire community and which provided an unsuitable and unsightly setting for the State Capitol. Because of these conditions, the Nashville Housing Authority, in conjunction with the Planning Commission of the City of Nashville, sponsored extensive studies by engineers, surveyors, and appraisers preparatory to the formulation of a redevelopment plan of slum clearance and urban redevelopment. The cost of this planning exceeded $140,000.-00, reimbursement for which was eventually provided by the United States through the Housing and Home Finance Agency.

Pursuant to the provisions of Resolution 50–1237 adopted by the City Council on June 26, 1950, the City of Nashville,

acting by and through its Mayor and City Clerk, executed a Corporation Agreement with the Housing Authority wherein the City agreed to provide and finance all local grants-in-aid for such a project to the extent and in the manner required by Title I of the Housing Act of 1949 (63 Stat. 413), and to pay one-third of the net cost thereof.

On April 7, 1952, the Board of Commissioners of the Nashville Housing Authority, by Resolution 61–52, found and determined that the Capitol Hill area was a blighted area as defined by Chapter 114 of the Public Acts of Tennessee of 1945, that the slum and blighted conditions existing therein were detrimental to the safety, health, morals and welfare of the community, that the area should be acquired and such conditions eliminated, and that a redevelopment plan should be carried out in the public interest. By this resolution, the Housing Authority approved and adopted the Redevelopment Plan for the Capitol Hill Redevelopment Project. On the same day, the Planning Commission for the City of Nashville approved the Redevelopment Plan.

The City Council, as the local governing body of the City of Nashville, after a public hearing held in accordance with law, adopted Resolution 52–471 finding that the slum and blighting conditions existing in the Capitol Hill area were detrimental to the safety, health, morals and welfare of the City and should be eliminated, and approving the Redevelopment Plan as submitted.

The Housing Authority in September 1952 entered into a Loan and Grant Contract with the United States, acting by and through the Housing and Home Finance Agency, in which the United States agreed to provide financial assistance, as provided for in Title I of the Housing Act of 1949, in the form of loans and grants and to pay the remaining two-thirds of the net cost of the Project.

Having obtained the necessary financial commitments and the requisite local approvals, the Housing Authority then proceeded to acquire, by direct purchase and by the exercise of its power of eminent domain, approximately 72 acres of land in the Project area. Upon acquisition of the land, the Housing Authority undertook, in conformity with federal regulations and the Redevelopment Plan, to relocate the 301 families and 196 individuals who resided in the area. After the relocation activities were completed, the Housing Authority proceeded to clear the land and develop and beautify the entire area. A wide boulevard, James Robertson Parkway, was built in an arc around the hill on which the State Capitol is situated. On each side of the boulevard, tracts were landscaped and developed for eventual use by commercial enterprises. At approximately the same time, the State of Tennessee acquired, cleared and landscaped adjacent lands on the steeper portions of Capitol Hill. These improvements by the State resulted in benefits to the Project for which the Housing Authority received a non-cash credit in the allocation of costs between the Housing Authority and the United States.

The total cost of the Project as of March 31, 1963 was $9,756,979. Of this amount, $5,696,560 was spent on land acquisition, $99,500 on site clearance, and $2,491,967 on site development. According to the most recently approved budget, the ultimate cost of the Project will be $11,727,901. Income from sales of land to private interests is expected to total $3,917,133, leaving a net project cost of $7,810,768. Two-thirds of the net project cost, or $5,207,179, is to be provided by federal grant. The remaining one-third, or $2,603,589, is charged to the Housing Authority. The Housing Authority's obligation is to be discharged by local cash grants totaling $1,488,422, and by non-cash credits [2] totaling $1,115,167.

2. The City receives a non-cash credit for the value of two facilities, a fire hall and a park, formerly located in the Project area and donated by the City to the

After development of the entire 72 acres in the Project, 17 parcels containing 38 acres were available for sale or lease to private interests. However, before offering these parcels for sale or lease, the Housing Authority executed and placed of public record a document entitled "RESTRICTIVE COVENANTS RUNNING WITH THE LAND OF THE NASHVILLE HOUSING AUTHORITY IN THE CAPITOL HILL REDEVELOPMENT PROJECT," by means of which the Housing Authority prescribed conditions and restrictions and retained controls designed to preserve the public purposes of the Project. The public character of these restrictions and conditions is clearly indicated by the Preamble:

"This DECLARATION, made this 20th day of January, 1958, by the Nashville Housing Authority, Nashville, Tennessee, * * * hereinafter called the 'Grantor';

WITNESSETH:

"WHEREAS, in furtherance of the objectives of the State Urban Redevelopment Law and the Federal statutes, the 'Grantor' has undertaken a program of clearance and redevelopment of slum and blighted areas in the City of Nashville, Davidson County, Tennessee, (hereinafter called the 'City'), and in this connection has undertaken a project known as the 'Capitol Hill Redevelopment Project' * * *; and

"WHEREAS, the Grantor has prepared and the City of Nashville * * * has * * * approved a plan (hereinafter called the 'Redevelopment Plan') providing for the clearance and redevelopment of the Project Area and the future uses of the land comprising such Area, a copy of which Plan is made a part hereof by reference; and

"WHEREAS, in order to enable the

Grantor to achieve the objectives of the Redevelopment Plan and particularly to make the land in the Project available, after acquisition and clearance by the Grantor, for redevelopment by private enterprise for the uses specified in the Redevelopment Plan, both the Federal Government and the City have undertaken to provide, and have provided, substantial aid and assistance to the Grantor through a Contract for Loan and Capital Grant dated September 26, 1952, in the case of the Federal Government, and a Cooperation Agreement dated July 7, 1950, in the case of the City; and

"WHEREAS, the Grantor is now the owner in fee simple of the land in the Capitol Hill Redevelopment Project hereinafter described in Article III hereof and is desirous of subjecting said land to the conditions, restrictions, reservations and easements herein set forth for the benefit of said land and the owner of each and every parcel thereof, their successors and assigns, upon whom same shall be binding as covenants running with the land;

"NOW, THEREFORE, The Nashville Housing Authority as the owner in fee simple of the land in the Capitol Hill Redevelopment Project in Nashville, Davidson County, Tennessee, * * * hereby declares that said land is and shall be held, transferred, sold, conveyed and occupied subject to the conditions, restrictions, reservations and easements hereinafter set forth which are hereby declared to be covenants running with the land and shall be binding upon the Grantor and all subsequent purchasers, owners, lessees, and successors in interest thereof for an initial period of 21 years from the 20th day of January, 1958, and shall be automatically continued thereafter for successive

Housing Authority. It also received a non-cash credit for benefits accruing to the Project from expenditures of the

State of Tennessee for the purchase, clearance and landscaping of the adjacent lands on Capitol Hill.

**6**

periods of ten years each, unless sooner terminated, amended or modified in the manner provided in Article IX hereof. The Grantor, both in its own right and also for the purposes of protecting the interests of the community and any other parties, public or private, in whose favor or for whose benefit the aforesaid restrictive covenants have herein been provided for, shall be deemed a beneficiary of said restrictive covenants which shall run in favor of the Grantor for the entire period during which said restrictive covenants shall be in force and effect, without regard to whether the Grantor remains an owner of any land or interest therein to which such restrictive covenants relate; and that as such beneficiary the Grantor shall have the right in the event of any breach of any said restrictive covenants to exercise all the rights and remedies and to maintain any actions at law or suits in equity or other proper procedure to enforce the curing of such breach of these restrictive covenants, to which beneficiaries of such restrictive covenants may be entitled, * * *."

Article IV of the covenants in defining the "general purpose" of the conditions, provides that the "real property described in Article III hereof is subjected to the conditions, restrictions, reservations and easements contained herein for the purpose of insuring the use and improvement of each parcel or subparcel of land in such a way as to produce an economically sound development of the entire project area and to reduce to a minimum any depressing and blighting influences."

Article V, requiring conformity to the plan for redevelopment, provides (Section 1) that "the land in the Project Area, and every part thereof, shall be devoted to, and only to the uses permitted by the Redevelopment Plan for the Project, so long as said Redevelopment Plan remains in effect."

Section 2 retains governmental control in all-inclusive terms both as to use and improvements, providing that "no use or change in use shall be established or made, nor shall any improvement be erected, constructed, placed, or altered on any building site until the proposal for such use or improvement is first submitted to and approved in writing by the Grantor. * * *"

Section 5 provides that "no covenant, agreement, lease, conveyance, or other instrument shall be effected or executed by the Grantor or by purchasers or lessees from it or any successors in interest of such purchasers or lessees, whereby land in the project area is restricted upon the basis of race, creed, or color, in the sale, lease or occupancy thereof."

By Article X it is specifically provided that the restrictive covenants shall run with the land and be binding upon the present owner and all parties claiming by, through, or under it. To enforce the covenants the Housing Authority specifically reserves, in addition to an ordinary action for damages, the right to "sue for and obtain an injunction prohibitive or mandatory."

The permanence of the Project is secured by provisions that the restrictive covenants are to continue in effect for a period of twenty-one years from January 20, 1958, and automatically thereafter for successive periods of ten years each unless released by 70% of the total number of owners who are vested with title to at least 70% of the land subjected to the restrictive covenants.

By deeds dated July 25, 1958 and March 20, 1959, the Housing Authority conveyed to the defendant, Holiday Inns of America, Inc., Parcel H, consisting of 46,343 square feet, for $104,742 and Parcel G, consisting of 44,582 square feet, for $90,029.00. In the contract for the sale and purchase, Holiday Inns of America, Inc. agreed to begin construction of a modern motel in accordance with plans and specifications at-

tached thereto. The contract of sale recites that:

" * * * the Seller believes that the redevelopment of the said land pursuant to the proposal of the Purchaser, and the fulfillment generally of this Agreement and the intentions set forth herein, are in the vital and best interests of the City and the health, safety, morals, and welfare of the residents, and in accord with the public purposes and provisions of the applicable State and Federal laws and requirements under which the Capitol Hill Redevelopment Project has been undertaken and is being assisted; * *"

The deeds transferring ownership recite:

"It is understood and agreed that one of the considerations moving to the Grantor in this transaction is the agreement on the part of the Grantee to erect and construct to the satisfaction of Grantor on the within described property improvements in accordance with the terms of Contract of Sale of the land herein conveyed * * *, compliance with which by Grantee shall be evidenced by a certificate * * * in form eligible for registration."

After acquiring title, Holiday Inns of America, Inc. constructed the 157 room motel—Holiday Inn-Capitol Hill.

▋ In view of the numerous and pervasive forms of governmental participation prior to the execution of the deeds, and the continuing governmental controls over future uses of the property which the Housing Authority has reserved in order to fulfill the public purposes for which the Project was designed and brought into being, the controlling issue is whether the State or its agencies have become, and continue to be, involved to such a significant extent and degree that in the use of the property the defendants are bound by the Equal Protection Clause prohibiting discrimination on the grounds of race or color. It must be conceded, as defendants vigor-

ously argue, that the Housing Authority has no voice in the actual day-to-day operation of the motel. Nevertheless, it is undeniable that the Authority has a vital interest in the Project and all property therein, including properties privately owned, an interest carefully and meticulously delineated in the recorded restrictive covenants, in the contracts of sale, and in the deeds.

The Supreme Court's opinion in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, decided April 17, 1961, would appear to point the way for deciding the present case in its statement of a test for state action under the Fourteenth Amendment upon facts not decisively different from those presented here. Burton, it is true, involved a "lease" to a privately owned corporation of space in a city-owned parking area for operation of a restaurant, whereas we are concerned in this case with a "sale" to a private corporation of property in a city-owned redevelopment Project for the operation of a motel. On the facts of the Burton case, the Supreme Court found state action to exist because the state "to a significant extent" was involved in private conduct. The Court there said:

"The Civil Rights Cases, 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835] (1883), 'embedded in our constitutional law' the principle 'that the action inhibited by the first section [Equal Protection Clause] of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.' Chief Justice Vinson in Shelley v. Kraemer, 334 U.S. 1, 13 [68 S.Ct. 836, 92 L.Ed. 1161] (1948). It was language in the opinion in the Civil Rights Cases, supra, that phrased the broad test of state responsibility under the Fourteenth Amendment, predicting its consequence upon 'State action of every kind * * * which

denies * * * the equal protection of the laws.' At p. 11 [of 109 U.S., at p. 21 of 3 S.Ct.]. And only two Terms ago, some 75 years later, the same concept of state responsibility was interpreted as necessarily following upon 'state participation through any arrangement, management, funds or property.' Cooper v. Aaron, 358 U.S. 1, 4 [78 S.Ct. 1401, 1404, 3 L.Ed.2d 5] (1958). It is clear, as it always has been since the Civil Rights Cases, supra, that 'Individual invasion of individual rights is not the subject-matter of the amendment,' 109 U.S. at p. 11, [3 S.Ct. at p. 21] and that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it.

" * * * to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which 'This Court has never attempted.' Kotch v. [River Port] Pilot Com'rs, 330 U.S. 552, 556 [67 S.Ct. 910, 912, 91 L.Ed. 1093]. Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." 365 U.S. at pp. 721–722, 81 S.Ct. at pp. 859–860.

In view of the facts of the present case, can it be denied with any realism that the state is truly involved in private conduct "to a significant extent"? Whether the degree of involvement is more or less than in Burton, can it be fairly said that it is not far-reaching and significant? In the Court's view the answer to these questions is clear and irresistible. Extensive involvement by the state, in many and varied forms and through various agencies, is evident not only in the conception, formulation, development, and carrying out of the overall public plan and project, but also in its continuation and perpetuation. The two aspects of the Project must not be over-looked, i. e., the clearance of the area of slums, and its redevelopment under a state-designed plan to be maintained under constant state control and supervision.

■ Because of the comprehensive and far-reaching controls retained by the Housing Authority over the property sold to defendant, any differences between such a sale and the lease agreement in the Burton case would appear to be more technical than real. The crucial test of state action is the actuality of state involvement rather than the form of the transaction. Cf. Hampton v. City of Jacksonville, 5 Cir., 304 F.2d 320, cert. denied, Ghioto v. Hampton, 371 U.S. 911, 83 S.Ct. 256, 9 L.Ed.2d 170. So completely are the private owners in the Capitol Hill Redevelopment Project burdened with governmental restrictions and controls that not even the slightest change can be made in the use of their properties without the prior approval of a public agency. Nor without similar public approval can alterations or improvements of any kind be made in any buildings or structures located upon such properties. It is obvious that these controls were specifically designed in the public interest to preserve the essential features and characteristics of the overall plan and to prevent a recurrence of conditions which would reflect adversely upon the Project Area or mar its appearance and value.

The parties have referred to numerous authorities dealing with the problem of state action under the Fourteenth Amendment in the context of racial discrimination. The facts in most of these cases are so far afield from the present situation that it would serve no useful purpose here to discuss them. Because they were concerned with projects somewhat similar to the Project now under consideration, mention, however, should be made of Barnes v. City of Gadsden, 174 F.Supp. 64, aff'd 268 F.2d 593 (5th Cir. 1959), cert. denied 361 U.S. 915, 80 S.Ct. 261, 4 L.Ed.2d 186; (an urban

redevelopment plan), and Dorsey v. Stuyvesant Town Corp., 299 N.Y. 512, 87 N.E.2d 541, cert. denied 339 U.S. 981, 70 S.Ct. 1019, 94 L.Ed. 1385 (1950); (a housing project). In both cases it was held on the facts presented that there was no state action within the sense and meaning of the Fourteenth Amendment. While these decisions on their facts are not as convincing of significant state action and involvement as are the facts of the instant case, and could be distinguished in a number of respects, the Court is convinced that any possible authority to be distilled from them, insofar as the issues presented in this case are concerned, has been displaced by the later ruling of the Supreme Court in Burton v. Wilmington Parking Authority, supra.

Entertaining these views the Court finds that the plaintiff is entitled to the relief sought by its complaint and an appropriate form of judgment will be submitted.