HOWARD JACOBSON, Respondent, *v.* NEW YORK RACING ASSOCIATION, INC., Appellant.

Second Department, March 5, 1973.

*Cahill, Gordon, Sonnett, Reindel & Ohl* (*David R. Hyde, O. Carlysle McCandless* and *Roger S. Fine* of counsel), for appellant.

*Jesse Moss* (*Sue Wimmershoff-Caplan* of counsel), for respondent.

HOPKINS, Acting P. J.   The respondent, a licensed owner and trainer of thoroughbred horses, has been granted stable space since 1952 at racetracks owned and operated by the appellant. In 1970 the respondent's license was suspended by the Racing Commission of the State of New York for a period of 45 days; the appellant refused to allot stalls to the respondent after the restoration of his license.   Alleging injury, the respondent commenced this action for damages.   The Special Term has denied the appellant's motion to dismiss the complaint.   We agree that the complaint states a cause of action, but we convert

the action into a proceeding pursuant to article 78 of the CPLR to review the appellant's refusal.

The respondent's complaint alleges (and we take the allegations to be true for the purposes of the appellant's motion to dismiss) that the appellant has a monopoly of thoroughbred racing in the State, except for a small racetrack at Canandaigua, New York, and that the appellant's refusal to provide stable space prevented the respondent from pursuing his livelihood as an owner and trainer of horses. The respondent alleges that the appellant's refusal was based on its decision that his character was not approved " as being sufficiently good to have him racing " at its tracks, a decision unjustified and contrary to law, because the Racing Commission is the sole authority entitled to pass on the character of persons engaged in racing. Moreover, the respondent alleges that the appellant's refusal " was made maliciously and wantonly to punish plaintiff for his criticisms of certain activities and policies " of the appellant " and his efforts to correct them, and as a warning to other licensed horsemen not to do so."

The appellant's primary basis for dismissal of the complaint rests on *Madden* v. *Queens County Jockey Club* (296 N. Y. 249) and cases which follow it (e.g., *Matter of Vaintraub* v. *New York Racing Assn.*, 28 A D 2d 660; *Segal* v. *Thoroughbred Racing Protective Bur.*, N. Y. L. J., July 31, 1967, p. 9, col. 1 [Supreme Ct., N. Y. County]; *Warfield* v. *New York Racing Assn.*, N. Y. L. J., July 28, 1971, p. 11, col. 8 [Sup. Ct., Queens County]; *Matter of Webster* v. *Roosevelt Raceway*, N. Y. L. J., Aug. 23, 1971, p. 14, col. 6 [Sup. Ct., Nassau County]; *Rocco* v. *Saratoga Harness Racing Assn.*, July 22, 1971 [Sup. Ct., Saratoga County]). *Madden* held that the owner of a racetrack may exclude any one from his property, because at common law proprietors of places of amusement and resort enjoyed " an absolute power to serve whom they pleased," and that the power continued " until changed by legislative enactment " (*Madden* v. *Queens County Jockey Club, supra,* pp. 253, 254). The appellant argues that while the Legislature has forbidden discrimination on account of race, color, creed or national origin (Civil Rights Law, § 40), it has not otherwise forbidden the exclusion of persons at racetracks, as it has in the instances of other enterprises (Civil Rights Law, § 40-b).

The question before us essentially is whether the common-law doctrine recognized by *Madden* has been changed by legislative action. The appellant now owns and operates Aqueduct Race Track (which is the place from which the patron in *Madden* was

excluded) and other racetracks by virtue of statutes adopted in 1955 — some eight years after *Madden* was decided (see Horse Racing Act, § 7-a; L. 1955, ch. 812, § 2; Pari-Mutuel Revenue Law, § 4-a; L. 1940, ch. 254, as amd. by L. 1955, ch. 813, § 1). Under those statutes the appellant received a franchise good for 25 years to conduct races with pari-mutuel betting at the Aqueduct, Belmont and Saratoga racetracks. As a nonprofit racing corporation, the appellant must secure the approval of its trustees by the Racing Commission and must dismiss on the request of the Racing Commission any member of its board or executive officer on certain specified grounds (Horse Racing Act, § 1-a, subd. 3; L. 1926, ch. 440, as amd. by L. 1955, ch. 812, § 1). The State receives as a franchise fee all the taxable income of the appellant after provision for the payment of Federal taxes and the amortization of debt contracted with the approval of the Racing Commission (Horse Racing Act, § 7-a; L. 1955, ch. 812, § 2). Upon dissolution of the appellant, its assets must be transferred to one or more exempt organizations defined under the Federal Internal Revenue Code as may be designated by the Governor (Horse Racing Act, § 1-a, subd. 2; L. 1955, ch. 812, § 1). The Racing Commission exercises strict supervisory control over the appellant, including the approval of the acquisition of real property and facilities (Horse Racing Act, § 7-b; L. 1955, ch. 812, § 3), the right to examine its books (Horse Racing Act, § 6-a; L. 1955, ch. 15, § 3; § 7-a; L. 1955, ch. 812, § 2), the appointment of one of the three stewards in charge of the racing (Horse Racing Act, § 9-a; L. 1955, ch. 15, § 5), the power to make rules for the conduct of pari-mutuel betting (Pari-Mutuel Revenue Law, § 7; L. 1940, ch. 254, as amd. by L. 1945, ch. 121, § 1) and the fixation of admission charges (Pari-Mutuel Revenue Law, § 15; L. 1940, ch. 254, as amd. by L. 1955, ch. 58, § 1).

We think that the aggregate weight of these circumstances demonstrates that the respondent cannot be deprived of a facility hitherto granted to him by an arbitrary refusal of the appellant. The requirements of due process must be met whenever "the State has so far insinuated itself into a position of interdependence * * * that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment" (*Burton* v. *Wilmington Parking. Auth.*, 365 U. S. 715, 725). Granted that the demands of due process are directed toward State action and **not** individual action (*Civil Rights Cases*, 109 U. S. 3, 11), when

the two merge as the result of the exercise of a public function or the identification of the State with the private enterprise, the action of the union takes on the character of State action.

Though the doctrine of State action has been initially considered in terms of racial discrimination (e.g., *Shelley* v. *Kraemer,* 334 U. S. 1; *Department of Conservation & Development* v. *Tate,* 231 F. 2d 615, cert. den. 352 U. S. 838), it clearly applies to all cases of arbitrary decision. Thus, State action has been found to exist when a public utility broadcast music on public buses (*Public Utilities Comm.* v. *Pollak,* 343 U. S. 451), a private college sought to discipline students (*Coleman* v. *Wagner Coll.,* 429 F. 2d 1120), a landlord tried to oust tenants (*Matter of Fuller* v. *Urstadt,* 28 N Y 2d 315) and a corporation operating a company town excluded one distributing religious pamphlets (*Marsh* v. *Alabama,* 326 U. S. 501). In all of these examples, the criterion was whether the State or Federal Government had "become so involved in the conduct of these otherwise private bodies that their activities are also the activities of these governments and performed under their aegis" (*Simkins* v. *Moses H. Cone Mem. Hosp.,* 323 F. 2d 959, 966; see, also, *Smith* v. *Holiday Inns of Amer.,* 336 F. 2d 630). As in many cases of constitutional issues, State action is a calculation of degree of State intervention or presence; when the State moves into the private domain, it brings with it the burdens borne by the State, as well as the benefits obtained.

It is not necessary in determining whether State action is present to find that a State function, such as housing, is being performed (cf. *Matter of Vinson* v. *Greenburgh Housing Auth.,* 29 A D 2d 338, affd. 27 N Y 2d 675). That was not the case in *Coleman* v. *Wagner Coll.* (429 F. 2d 1120, *supra*), where a private college was the subject of the litigation, or in *Marsh* v. *Alabama* (326 U. S. 501, *supra* [see, also, *Food Employees* v. *Logan Plaza,* 391 U. S. 308]), where a private corporation was the party against whom the claim of constitutional deprivation was aimed. A public function is but one of the evidences of State action; public regulation, public financial assistance and the use of publicly delegated powers (cf. *Railroad Trainmen* v. *Howard,* 343 U. S. 768) are other indicia. But it is not entirely beyond reason to put racing into a form of a public function, given the revenue-raising purpose it serves for the State, not only as a direct source through on-track pari-mutuel betting, but also as the means by which off-track betting is conducted. In short, racing can be reasonably viewed as an amusement now turned into a revenue-raising enterprise for the benefit of the State

(cf. *Saratoga Harness Racing Assn.* v. *Agriculture & N. Y. State Horse Breeding Development Fund*, 22 N Y 2d 119, 123, 127).

Nevertheless, we need not depend on the factor of public function alone. It is the cumulative effect of all the factors showing State involvement which must be considered (*Burton* v. *Wilmington Parking Auth.*, 365 U. S. 715, 722, *supra*; *Evans* v. *Newton*, 382 U. S. 296, 301). We think that the close regulation of the appellant by the Racing Commission, the delegation to the appellant of the conduct of pari-mutuel betting, and the control over the affairs of the appellant exercisable by the Racing Commission are strong evidence of State involvement.[1] In this context the franchise granted by the State, the franchise fee consisting of the taxable income of the appellant subject to stipulated deductions, and the disposition of the assets of the appellant to "exempt" organizations designated by the Governor on its dissolution become highly significant. In *Madden* v. *Queens County Jockey Club* (296 N. Y. 249, 255–256, *supra*), the difference between a franchise and a license was delineated. The defendant in *Madden* held a license (cf. McKinney's Unconsol. Laws of N. Y., Book 65, § 7909), but a franchise may be granted only to a nonprofit corporation, such as the appellant here, and then only on the payment of the substantial franchise fee (Horse Racing Act, § 7-a; L. 1955, ch. 812, § 2). The term of a license can be no more than a year; the term of the franchise may be for a period as long as 25 years. As *Madden* held, a franchise is commonly conceived to be a right granted by the State to engage in an activity not ordinarily belonging to an individual and would not include a license to operate a racetrack.

This, in our opinion, was changed by statute.

The choice of the word "franchise" in the 1955 legislation in the face of this distinction drawn in 1947 in *Madden* appears deliberate to us, as indicating an intent to confer a benefit on the appellant by assuring a right to continue racing at its tracks for as long as 25 years.[2] Thus, it signified a legislative decision

1. The respondent contends that the State gave financial assistance to the appellant at the time of its formation by permitting the postponement of the pari-mutuel tax owing to the State on the first $5,000,000 received in income from betting in each year. It is true that the statute provides for this withholding (Pari-Mutuel Revenue Law, § 9-a, subd. 3; L. 1955, ch. 813, § 3). On this record, however, we are unable to come to any conclusion whether the State permitted such postponement, or as to the period of such postponement, or as to the benefit thus received by the appellant.

2. The franchise may be revoked for causes set out in the statute only after notice and hearing; and revocation is subject to judicial review (Horse Racing Act, § 7-a; L. 1955, ch. 812, § 2; § 8; L. 1951, ch. 544, § 2).

to grant a right not existing at common law, and, accordingly, in the light of the opinion in *Madden*, a true franchise. As a holder of a franchise, the appellant is then placed in the role of an instrumentality of the State (cf. *Ghioto* v. *Hampton*, 304 F. 2d 320, cert. den. 371 U. S. 911; *Kerr* v. *Enoch Pratt Free Lib. of Baltimore City*, 149 F. 2d 212; *Everett* v. *Riverside Hose Co. No. 4*, 261 F. Supp. 463).

The appellant urges that the vigor of *Madden* has survived in the recently decided case of *People* v. *Licata* (28 N Y 2d 113). In *Licata*, the defendant was convicted of criminal trespass at Aqueduct Race Track, because he entered it after notice to him not to enter. Though the court expressly recognized the rule in *Madden* (*People* v. *Licata, supra*, p. 115), there is no showing that the constitutional issue raised here was before the court; and, indeed, the court said that the conviction should be affirmed even if Licata had the right to enter, since he had been told to leave and had remained — conduct violative of the statute (p. 117). *Licata* does not therefore control the issue here.

But it is our view that constitutional rights should not rise or fall on the narrow ground of a definition of franchise or license. It is the combined force of the factors establishing State involvement to which we have already referred, together with the terms of the franchise and franchise fee, which convinces us that State action was asserted at the time the appellant barred the respondent from use of its facilities. As the respondent alleges that this was an arbitrary and unjustifiable decision, his complaint is sufficient.

The appellant also urges that the complaint must be dismissed on the ground that another action is pending for the same cause. The other action was brought by the respondent and others in the United States District Court for the Southern District of New York. That action seeks damages and injunctive relief against the appellant, in company with others, based on claimed violations of the Federal antitrust laws (U. S. Code, tit. 15, §§ 1, 2, 15, 16). We see no identity of issue or parties in the two actions which would require the dismissal of this action (CPLR 3211, subd. [a], par. 4); the key issue of State action presented in this action is not essential to the prosecution of the Federal action and hence the actions are dissimilar (see 4 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 3211.29), though the proof in one might be relevant in the other.

But the respondent may not recover damages for the arbitrary conduct of the appellant, even though it may have been maliciously disposed toward him (*Rottkamp* v. *Young*, 21 A D 2d

373, affd. 15 N Y 2d 831; *Weiss* v. *Fote,* 7 N Y 2d 579; *Gross* v. *State of New York,* 33 A D 2d 868; *Band* v. *Town of Colonie,* 36 A D 2d 785; *Lockwood* v. *Village of Buchanan,* 18 Misc 2d 862). Since the appellant was performing State action, it may not be held in damages for a wrongful exercise of power. Instead, the respondent is entitled to a review of the appellant's act under article 78 of the CPLR (cf. CPLR 7802, subd. [a], 7803, subd. 3).[3] Hence, the action should be converted into a special proceeding (CPLR 103, subd. [c]; 3017, subd. [a]) and the appellant should file a return.[4]

It is perhaps needless, but we repeat, as we have on other occasions, that our determination of the sufficiency of the respondent's pleading is not an indication in any respect as to the merits of his claim. Nor do we at this time, on this limited record, determine the dimensions of due process to which he was entitled, or which should be applied to the appellant's exercise of discretion (cf. *Matter of Sumpter* v. *White Plains Housing Auth.,* 29 N Y 2d 420).

The order of the Special Term should be modified by adding thereto a provision converting the action into a proceeding under article 78 of the CPLR to review the appellant's refusal; and the order, as so modified, should be affirmed insofar as appealed from, without costs.

BENJAMIN, J. (concurring in part and dissenting in part). In my opinion neither the rule of *Madden* v. *Queens County Jockey Club* (296 N. Y. 249) nor conversion of this action into a special proceeding bars recovery of damages in this case.

The appellant was organized as a " non-profit racing association " pursuant to section 1 of chapter 812 of the Laws of 1955. Subdivision 3 of that section gives the appellant " all the general powers of corporations created under the laws of the state, including the powers and obligations of stock corporations ". One of these obligations is amenability to suit (Business Corporation Law, § 202, subd. [a], par. [2]; Not-For-Profit Corporation Law, § 202, subd. [a], par. [2]). In this respect the appellant is treated as an ordinary domestic corporation. As the majority rightly point out however, the appellant's business is inextricably intertwined with substantial State involve-

---

3. It should be noted that the respondent claims no rights under the Civil Rights Laws of 1964 (U. S. Code, tit. 42, § 2000a *et seq.*; cf. *Daniel* v. *Paul,* 395 U. S. 298).

4. Although damages may be recoverable in a proceeding under article 78 of the CPLR, the statute precludes recovery when damages do not lie in an action (CPLR 7806).

ment. The appellant received a 25-year State franchise to conduct races with pari-mutuel betting. Its trustees must be approved by the State Racing Commission and may be removed at the commission's request upon specified grounds (Horse Racing Act, § 1-a, subd. 3; L. 1955, ch. 812, § 1). The State receives as a franchise fee all of the appellant's taxable income after provision for the payment of Federal taxes and the amortization of approved debt (Horse Racing Act, § 7-a; L. 1955, ch. 812, § 2). Upon the appellant's dissolution, its assets must be transferred to one or more exempt organizations defined under the Federal Internal Revenue Code, as designated by the Governor (Horse Racing Act, § 1-a, subd. 2; L. 1955, ch. 812, § 1). The Racing Commission exercises strict control over the appellant (Horse Racing Act, §§ 6-a, 7-a, 7-b, 9-a; Pari-Mutuel Revenue Law, §§ 7, 15). Again, as the majority point out, these circumstances warrant a finding of State action.

However, these attributes of public involvement do not preclude an award of damages to the respondent as the majority hold. This is so for several reasons. First, the appellant's private charter and private characteristics are ignored by the majority holding. Second, conversion of the action into a proceeding under article 78 of the CPLR does not preclude damages when damages may be recovered in an ordinary action (CPLR 7806). Third, *Madden* v. *Queens County Jockey Club* (296 N. Y. 249, *supra*) does not bar a common-law action for damages. *Madden,* decided in 1947, merely held that Queens County Jockey Club was able to exclude one who it had reason to believe was a professional bookmaker, an unlawful occupation. That situation is wholly absent here and, accordingly, *Madden* is inapplicable to the case at bar. Here, the respondent may lawfully earn his living on the appellant's premises. He has a license to do so granted to him by the Racing Commission and has duly been allotted stall space in the past. In addition, the racetrack in *Madden* was operated under entirely different auspices than the racetrack at bar, since it was an entirely private enterprise. To allow the appellant to bar the respondent from racing by denying him stall space is tantamount to overruling the Racing Commission, which has restored the respondent's license after a short period of suspension. Fourth, the appellant is engaged in a proprietary function (*Madden* v. *Queens County Jockey Club,* 296 N. Y. 249, 253, *supra*). Even if the appellant's business were operated directly by the State, the State's liability would be " determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or

corporations '' (Court of Claims Act, § 8; *Duren* v. *City of Binghamton,* 172 Misc. 580, affd. 258 App. Div. 694, affd. 283 N. Y. 467).

The cases relied upon by the majority for the holding that damages may not be recovered by the respondent herein all hold that no public officer is responsible in a civil suit for a judicial or discretionary act, however wrongly or maliciously motivated. I have no quarrel with this rule, but I find it to be inapplicable to the facts of this case. Thus, in *Rottkamp* v. *Young* (21 A D 2d 373, affd. 15 N Y 2d 831) the defendant was acting in his capacity of Building Inspector and his refusal to issue a permit was a discretionary and not a ministerial act (p. 376). In *Weiss* v. *Fote* (7 N Y 2d 579) the plaintiffs sought to hold the City of Buffalo liable for negligence in the design of a traffic light, a design which was adopted by the city's Board of Safety after '' considered judgment '' on the '' clearance interval '' (p. 586). In *Gross* v. *State of New York* (33 A D 2d 868) the claim for damages was based upon the allegation that the Secretary of State of the State of New York was exercising a purely ministerial (as opposed to a governmental) function in approving or disapproving corporate names. *Band* v. *Town of Colonie* (36 A D 2d 785) involved the revocation of a permit by the defendant's Superintendent of Buildings, as did *Lockwood* v. *Village of Buchanan* (18 Misc 2d 862 [by the defendant's Building Inspector]). A similar pattern does not appear in this record. Thus, to invest the appellant with accoutrements of sovereign immunity which it does not claim and to which it is not entitled is to give too much weight to the regulatory scheme under which the appellant conducts its business and too little weight to the appellant's private corporate status and to the proprietary nature of such business.

Accordingly, I vote to affirm the order of the Special Term insofar as appealed from, without modification.

MUNDER, J. (dissenting). I dissent and vote to reverse the order insofar as appealed from and to grant the motion to dismiss the complaint as against the appellant.

I find considerable merit in the view of my colleague, Acting Presiding Justice HOPKINS, that the rule of *Madden* v. *Queens County Jockey Club* (296 N. Y. 249) should not control in the present circumstances, since the operation of racetracks by the appellant is no longer purely private but has taken on the character of State action. However, I think we are bound by the application of the *Madden* rule, subsequent to the enactment of chapters 812 and 813 of the Laws of 1955, in those cases uphold-

ing the exclusion of patrons (see *Matter of Vaintraub* v. *New York Racing Assn.*, 28 A D 2d 660, and *People* v. *Licata*, 28 N Y 2d 113, in which *Vaintraub* was cited with approval).

GULOTTA and BRENNAN, JJ., concur with HOPKINS Acting P. J.; BENJAMIN, J., concurs in part and dissents in part and votes to affirm the order insofar as appealed from, without modification, in an opinion. MUNDER, J., dissents and votes to reverse the order insofar as appealed from and to grant the motion to dismiss the complaint as against appellant.

Order modified by adding thereto a provision converting the action into a proceeding under article 78 of the CPLR to review said defendant's refusal to allot stalls to plaintiff. As so modified, order affirmed insofar as appealed from, without costs.