Alexander Berman, J.
Plaintiffs, husband and wife, are physicians who number among their patients approximately 50 residents of a proprietary nursing home and health related facility known as Grace Plaza of Great Neck. In this action, they seek a permanent injunction restraining the proprietors of Grace Plaza from denying them access to these patients.
Grace Plaza accommodates approximately 214 aged and infirm people, of whom 167 occupy the first three floors which constitute the health related facility portion, and the balance of 47 occupy the nursing home portion of the building on the fourth floor.
Defendants claim that they have an absolute right to exclude from their privately owned facility any persons they deem undesirable. Furthermore, it is their contention, in any event, that they have done so with good cause in that plaintiffs have failed to comply with certain policies established by them, have made excessive numbers of visits to their patients, have been intransigent, unco-operative and abrasive in their attitude toward management and have unduly interfered with the operation of their facility.
Grace Plaza was constructed by defendants George Strauss-man and Edward Straussman, partners and coadministrators of this institution which was opened on or about May 15, 1972. They retain a consulting physician on a part-time basis, and a full-time director of nurses, all as required by the New York State Hospital Code.
The average age of the resident patients is 85 years. Some *123 of them are ambulatory and others are bedridden, but all of plaintiffs’ patients and residents are entitled to receive medicare benefits under Public Law 89-97 (79 US Stat 286) of the 89th Congress (HR 6675, July 30, 1965, cited as "The Social Security Amendments of 1965”). Most of these residents are also recipients of medicaid benefits.
This facility operated under a certificate of approval issued by the Public Health Council of the State of New York, and pursuant to section 700.3 of the State Hospital Code (10 NYCRR 700.3), is required to "comply with all pertinent Federal laws and regulations enacted pursuant thereto, applicable State law including the Public Health Law and the Mental Hygiene Law and codes, rules and regulations enacted pursuant thereto”.
The disputes between the administrators of Grace Plaza and plaintiff, in part, concerned several so-called policies established by defendants, as follows: (a) policy disapproving of xeroxed doctor’s orders; (b) policy limiting to 30 the number of patients that each doctor could treat in the facility; (c) policy of referral for consultants’ services such as podiatrists; and (d) policy against admission of physically or mentally unsuitable persons. Defendants claim that plaintiffs refused to comply with these policies, in that they continued to xerox doctors’ orders; in that they objected to a limit on the number of patients that they could treat at the facility; that they engaged a consulting podiatrist on one occasion in violation of the policy that such consultant should meet with management’s prior approval; and that on one occasion, plaintiff, Dr. Allan Fried, certified that a certain patient was eligible for admission in violation of their policy.
In addition to the policy disputes, defendants maintain, inter alia, that plaintiffs visited their patients far in excess of their needs; that plaintiff, Dr. Allan Fried, interfered with management, in that on one occasion, he unnecessarily called the police to investigate an incident involving an employee of Grace Plaza with a patient, in opposition to management’s disposition of the matter; and that plaintiffs generally disputed and resisted many of the suggestions of management, conducted themselves in an unfriendly and hostile manner toward defendants, and complained constantly about the way in which the facility was managed.
These conflicts culminated in a confrontation on February 4, 1975, when defendants refused to admit plaintiffs. Defendants *124 thereupon notified all of plaintiffs’ patients, or their designated relatives, of the suspension of plaintiffs’ privileges, suggesting that they designate other personal physicians, or, in the alternative, that they remove from the facility if they insisted that plaintiffs remain as their physicians. This action ensued and a temporary injunction was sought and granted, enjoining defendants from interfering with plaintiffs’ access to their patients at Grace Plaza, pending the determination thereof.
Defendants argue that the complaint fails to state a cause of action, citing Leider v Beth-Israel Hosp. Assn. (11 NY2d 205). They contend that the established law of the State of New York is that a proprietary hospital, or other similar privately owned facility, has an absolute right to terminate the privilege of a physician practicing in such facility.
The Court of Appeals in Leider v Beth-Israel Hosp. Assn. (supra) which involved a physician who sought to enjoin the hospital from depriving him of privileges to treat future private patients, whom he might arrange to be admitted thereto, held (p 209): "His exclusion from the staff and the 'off-service’ privileges, incident to staff membership, including the privileges to care for private patients in the hospital, rested entirely in the discretion of the board of trustees * * * Consequently, the denial to the plaintiff of future courtesy privileges following the termination of his annual employment constituted no legal wrong. ” (Emphasis supplied.)
A similar rationale was expressed in Halberstadt v Kissane (31 AD2d 568), concerning a physician who sought reinstatement to the medical staff of a private hospital. Also, in Matter of Salter v New York State Psychological Assn. (14 NY2d 100), which involved a private association, the court held that it would not interfere with the right of such a private organization to restrict its membership. The court, in that case, rejected the contention of plaintiff that the defendant association was (p 103) "so nearly an arm of the State itself that equal protection and due process constitutional requirements make it unlawful for it to reject qualified and certified applicants.”
The cases cited above dealt, however, with situations in which there was no substantial State involvement. As defined in Jacobson v New York Racing Assn. (41 AD2d 87, 91) the criterion for a finding of State action is "whether the State or Federal Government had 'become so involved in the conduct *125 of these otherwise private bodies that their activities are also the activities of these governments and performed under their aegis’. * * * As in many cases of constitutional issues, State action is a calculation of degree of State intervention or presence; when the State moves into the private domain, it brings with it the burdens borne by the State, as well as the benefits obtained.” On appeal, the Jacobson decision (supra), was modified (33 NY2d 144), but the Court of Appeals, in its decision, reiterated the doctrine of State action in this strong language (p 150):
"This general principle that the arbitrary action of a private association is not immune from judicial scrutiny has, for example, been applied in instances of a private hospital arbitrarily denying a licensed physician staff privileges (e.g., Greisman v Newcomb Hosp., 40 NJ 389; see generally, Ann., Physician, Surgeon — Hospital Exclusion, 37 ALR 3d 645, 661-663; contra, Leider v Beth-Israel Hosp. Assn., 11 NY2d 205; but see Public Health Law, § 2801-b, subd 1, effectively limiting the Leider case), and a medical society’s arbitrary exclusion of a licensed physician where there is a showing of 'economic necessity’ for membership and 'monopoly power’ over the profession (e.g., Falcone v Middlesex County Med. Soc., 34 NJ 582, 591, 597; see, also, Matter of Salter v New York State Psychological Assn., 14 NY2d 100, 106-107 [recognizing the rule that admission was compellable but denying relief on the facts]; see, generally, Ann., Professional Society-Membership, 89 ALR 2d 964; Note, Judicial Control of Actions of Private Associations, 76 Harv. L. Rev. 983, 1087-1095). The situation before us is sufficiently analogous to warrant adaptation of this principle.
"On this view, the interesting 'state action’ question need not be reached or decided. We note, however, that as a limit on the reach of the Fourteenth Amendment, the !state action’ doctrine is alive and well. ” (Emphasis supplied.)
In the case of proprietary nursing homes and health related facilities such as here, State action is not merely marginally involved, but, in fact, the industry is immersed in State action. Care for the aged is a matter of vital concern to the State. The health and welfare of a large percentage of the population is directly affected. The concern of the State is expressed in article 28 of the Public Health Law, section 2800 thereof captioned "Declaration of Policy and Statement of Purpose”: "Hospital and related services including health-re *126 lated service of the highest quality efficiently provided and properly utilized at a reasonable cost, are of vital concern to the public health. In order to provide for the protection and promotion of the health of the inhabitants of the state, pursuant to section three of article seventeen of the constitution, the department of health shall have the central, comprehensive responsibility for the development and administration of the state’s policy with respect to hospital and related services, and all public and private institutions”.
Not only does this declaration of policy indicate the degree of State involvement, concern and degree of intervention, but, in addition, the State and Federal Government, by reason of medicare and medicaid, are the major source of income for these institutions such as the one owned by these defendants. The close regulation by the State, as authorized by the Public Health and Welfare Law, and the concomitant State Hospital Code, define and regulate almost every phase of the operation and administration of such facilities.
"The State urges in effect that the corporation’s right to control the inhabitants of Chicasaw is coextensive with the right of a homeowner to regulate the conduct of his guests. We cannot accept that contention. Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. Cf. Republic Aviation Corp. v Labor Board, 324 US 793, 798, 802, n. 8. Thus, the owners of privately held bridges, ferries, turnpikes and railroads may not operate them as freely as a farmer does his farm. Since these facilities are built and operated primarily to benefit the public and since their operation is essentially a public function, it is subject to state regulation.” (Emphasis supplied.) (Marsh v Alabama, 326 US 501, 505, 506.)
"When a private organization undertakes functions that are affected with a public interest, the United States Supreme Court has held in the well-known company town case that the private organization is subject to some governmental responsibilities (Marsh v Alabama, 326 US 501).” (Danbois v New York Cent. R. R. Co., 12 NY2d 234, 239-240.)
"Nevertheless, we need not depend on the factor of public function alone. It is the cumulative effect of all the factors showing State involvement which must be considered (Burton v Wilmington Parking Auth., 365 US 715, 722, supra; Evans v *127 Newton, 382 US 296, 301). We think that the close regulation of the appellant by the Racing Commission, the delegation to the appellant of the conduct of pari-mutuel betting, and the control over the affairs of the appellant exercisable by the Racing Commission are strong evidence of State involvement.” (Jacobson v New York Racing Assn., 41 AD2d 87, 92.)
"An example of private conduct permeated by state action is found in Smith v Holiday Inns of America, 220 F Supp 1 (M.D. Tenn. 1963), afFd, 336 F2d 630 (6th Cir 1964). Smith concerned a privately-owned motel built as part of a Nashville, Tennessee urban renewal project. * * * 'The single pervasive fact which defendants seek to ignore but which this court cannot is that this motel is part and parcel of a large, significant, and continuing public enterprise * * * This motel was conceived by the planners of this project, its creation was made possible by the execution of the project, and its existence is now governed to a great degree by the project’s predetermined design and controls.’ Smith v Holiday Inns of America, 336 F2d at 634.” (40 Brooklyn L. Rev. 1055, 1059, n. 29.)
The Fifth Amendment to the Constitution of the United States prohibits deprivation of property without due process of law. The practice of medicine by licensed physicians is a valuable property right. It entails here the exercise of that right within a facility, which may be described as quasi-public, because of State action. This property right, protected by the Constitution, may not then be arbitrarily curtailed, or terminated, for to do so would be a clear violation of plaintiffs’ Fifth Amendment rights.
At this point, before considering whether there was an arbitrary and unwarranted exclusion of the plaintiffs, it is significant to note a section of the Social Security Law of 1965 (79 US Stat 286; US Code, tit 42, § 1395 et seq.) entitled, "Free choice by patient guaranteed.” Section 1395-a thereof provides: "Any individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter, if such institution, agency, or person undertakes to provide him such services.” In an oblique way, therefore, patients of the plaintiffs would, in effect, be denied freedom of choice of their physicians, if defendants are permitted to exclude plaintiffs. This is so even though defendants, in their communication with plaintiffs’ patients on February 5, 1975, *128 advised them that they could select another physician of their choice, with the proviso however, that, in such event, they would be required to remove themselves from the facility. Considering this alternative in the light of the circumstances, and that this option was offered persons who were of the average age of 85 years, extremely sensitive to abrupt changes, sick and infirm, and in many cases indigent, it is hardly more than Hobson’s choice.
Subdivision 1 of section 2801-b of the Public Health Law prohibits the governing body of a hospital from curtailing, terminating or diminishing in any way a physician’s privileges in a hospital without stating the reason therefor. Assuming arguendo, as defendants so contend, that for the purpose of this section, "hospital” includes a nursing home, or a health related facility, the court, nevertheless, disagrees with their conclusions as to the effect thereof. Defendants interpret this section to mean that the reasons for termination need not be set forth in any particular manner or even expressed "or articulated in such a way as to be labeled as reasons.” They contend that plaintiffs should be able to gather the reason from the history of the incidents which occurred, and that this imputed knowledge is sufficient compliance with the requirement of the statute. The court disagrees. It is the plain intention of this section that a burden is imposed on the "hospital” to clearly and definitively inform the physician as to the reasons for termination. To accept defendants’ interpretation would completely emasculate the effectiveness of this section, which was intended as a preface to section 2801-c of the Public Health Law which provides: "The supreme court may enjoin violations or threatened violations of any provisions of this article * * * Notwithstanding any limitation of the civil practice law and rules, such court may, on motion and affidavit, and upon proof that such violation is one which reasonably may result in injury to any person, whether or not such person is a party to such action, grant a temporary injunction upon such terms as may be just, pending the determination of the action.”
The evidence discloses that, as a matter of fact, no reasons, oral or in writing, were given to plaintiffs at the time of their exclusion. Furthermore, it is obvious under this section, that if the facility is required to give reasons, that such reasons must be valid ones. These two subdivisions of section 2801 clearly indicate a design and intention on the part of the Legislature *129 to protect the rights of physicians in privately or publicly owned facilities, and to afford them at least a modicum of due process.
Turning now to the issue of whether there was good cause for plaintiffs’ exclusion, defendants point to the alleged violation of policies. These consist of two major items; first, the prohibition of xeroxing doctor’s orders; and second, the limitation as to the number of patients. Neither of these policies has been established as valid or acceptable to the State or Federal bodies having jurisdiction. The court cannot, under these circumstances, accept them as controlling, nor, for that matter, within the power of defendants to establish. Furthermore, the limitation of patient policy has not been violated, since these plaintiffs together have less than 60 patients. The third policy, relating to the selection of auxilliary services, such as a podiatrist, is not valid, for the section of the code relating thereto specifically provides, contrary to defendants’ policy, that such consultant must be selected and approved by the personal physician when needed and not by the facility. (State Hospital Code, 10 NYCRR 741.1 [j] [2]).
The other category of complaints relates to such matters as the report of plaintiff, Dr. Allan Fried, to the police regarding his patient’s encounter with an employee at Grace Plaza. This may, at most have been an error of judgment on his part. There is no reason for the court to believe that his motivation was other than in the interest of his patient. All of the other complaints, except the one relating to excessive patient visits by plaintiffs, the court finds to be of a contrived or trivial nature, and inadequate to constitute reasonable grounds for defendants’ action. Nor do the personality conflicts between the parties rise to the stature of valid reasons for their exclusion.
One of the alleged prime sources of disenchantment with plaintiffs, and on which there was considerable testimony, related to the claim of excessive visits by plaintiffs to their patients. Dr. Lester Corn, the consultant for this facility, who also has patients therein, and who is at the same time in the conflicting and unenviable position of directing policy, testified that, in his opinion, there were excessive visits and that such visits were psychologically harmful to these patients. Another physician, Deputy Commissioner of Health Murray, of the County of Nassau, analyzed the progress notes of plaintiffs and came to the conclusion that 75% of the visits were *130 unnecessary. On the other hand, a witness who testified for plaintiffs, a Dr. Levine, disagreed. After reviewing these same progress notes, as well as many of the other records pertaining to these patients, the latter reached the conclusion that the number of visits was within reasonable limits and appeared to be necessary. On the basis of this conflicting testimony, it is the finding of this court that the evidence does not support the claim of defendants in this regard. In this connection, it should also be noted that the. conclusions of Dr. Murray were hot based upon findings after a hearing, and that plaintiffs were not consulted or called to testify or be heard with regard thereto.
It is the finding of this court that plaintiffs have established the allegations contained in their complaint by a preponderance of the evidence, and the court concludes that they were excluded from defendants’ facility arbitrarily and without just cause, and that they are entitled to a permanent injunction as prayed for in the complaint.
Implicit in this decision is the determination by the court amending the pleadings of both sides to conform to the proof.